**STATE of Maine**

**v.**

**George Alfred LEVESQUE.**

Supreme Judicial Court of Maine.

Sept. 29, 1971.

William H. Clifford, Jr., Androscoggin County Atty., Jack O. Smith, Asst. County Atty., Auburn, for plaintiff.

Platz & Day, by J. Peter Thompson, Lewiston, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY and WERNICK, JJ.

DUFRESNE, Chief Justice.

The defendant Levesque was tried by jury and found guilty of the crime of robbery at the January term, 1970, of the Superior Court in the County of Androscoggin. He appeals from the judgment of conviction and sentence to a term of not less than 5 years and not more than 12 years in the Maine State Prison. His appeal is denied.

The defendant's initial contention is that the State's failure to have an official court reporter present at the grand jury session at which he was indicted and to have a record made of the testimony given against him before that body deprived him of a fair trial guaranteed by the due process clauses of our State and Federal Constitutions and denied him as well the equal protection of the laws mandated by these constitutional provisions. See, Article I, Section 6-A of the Constitution of Maine and Amendment XIV to the Constitution of the United States. His violation of due process claim is grounded on the assertion that absence of a record of the grand jury proceedings taints the fairness of his subsequent trial since it denies him the opportunity of full confrontation of the witnesses against him by precluding their impeachment through inconsistent statements which they may have made at the grand jury session. He bases his equal-protection-of-the-law violation upon the fact that Rule 6(d), M.R. Crim.P., permits the presence of an official court reporter at grand jury sessions in the discretion of the court upon the showing of good cause by persons who, by reason of their having been held to answer on probable cause hearing, know that the grand jury will be determining whether an indictment should be found against them, while denying the same opportunity to persons who first learn of the grand jury's interest in them following their actual indictment by the grand jury.

"While the possibility of having the testimony produced before the grand jury reported by a court reporter is new to Maine procedure, the principle of inquiring into the proceedings before the grand jury *under appropriate circumstances* is not." (Glassman, Maine Practice, Commentary, § 6.6, at page 59—emphasis added). The rule of secrecy, however, long established in this State remains. We recently had occasion to re-affirm it when we said in State v. Fitzherbert, 1969, Me., 249 A.2d 760:

"[I]n this jurisdiction courts are not authorized to inquire into the sufficiency of the evidence on which the grand jury acted. Such, we believe, is the better reasoned rule adhered to by a majority of those appellate tribunals which have had occasion to pass upon the issue."

In State v. Perkins, 1971, Me., 275 A.2d 586, we further added:

"We have no rule or statute which allows such an inquiry, nor do we feel inclined to do so by judicial fiat."

This Court recognized that where the secrecy rule would unjustifiably thwart the search for truth and impede the proper administration of justice, it would have to give way and disclosure of grand jury testimony would be permissible for impeachment purpose. In State v. Benner, 1874, 64 Me. 267, we said:

"When a witness testifies differently in the trial before the petit jury from what he did before the grand jury, the grand jurors may be called to contradict him whether his testimony is favorable or adverse to the prisoner. So, in all cases when necessary for the protection of the rights of parties, whether civil or criminal, grand jurors may be witnesses."

■ But our Court never addressed itself specifically to the constitutional issues raised by the defendant. We note initially that Rule 6(d) merely authorizes the presence of an official court reporter at a grand jury session in the court's discretion and upon good cause being shown. Transcription of the testimony is made permissive, not mandatory. The federal rule, after which our own rule has been patterned, has been so construed by the federal authorities. United States v. Caruso, 1966, 2d Cir., 358 F.2d 184; McCaffrey v. United States, 1967, 10th Cir., 372 F.2d 482; Jack v. United States, 1969, 9th Cir., 409 F.2d 522. See, however, Rule 16(a), M.R.Crim. P., as amended December 1, 1969 which provides, when a court reporter is present in the grand jury room under Rule 6(d) that—

"(a) Discovery and Inspection. Upon timely motion of a defendant and upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph designated books, papers, documents, or tangible objects which are within the possession, custody, or control of the state, including * * * transcripts of the testimony of witnesses before the grand jury, * * * "

■ Failure to transcribe grand jury proceedings and provide the accused with a transcript of grand jury testimony is not a denial of due process. United States v. Watson, 1970, 9th Cir., 421 F.2d 1357. Nor is it an unconstitutional practice or an invasion of a constitutional right. Schlinsky v. United States, 1967, 1st Cir., 379 F.2d 735; United States v. Cianchetti, 1963, 2d Cir., 315 F.2d 584; United States v. Labate, 1959, 3d Cir., 270 F.2d 122, cert. denied sub nom. Sussman v. United States, 361 U.S. 900, 80 S.Ct. 211, 4 L.Ed.2d 157; Baker v. United States, 1969, 5th Cir., 412 F.2d 1069; United States v. Hensley, 1967, 6th Cir., 374 F.2d 341; Loux v. United States, 1968, 9th Cir., 389 F.2d 911; Maestas v. United States, 1965, 10th Cir., 341 F.2d 493.

The defendant's argument for an absolute constitutional right to the presence of an official court reporter to transcribe grand jury testimony and for a transcript of the

minutes of the proceedings is based on the theory that such practice would be conducive to more even justice since grand jury witnesses having the knowledge that their words may thereafter be reproduced against them are more likely to tell the unqualified truth. Though we do admit that such considerations might be an additional safeguard to protect the accused from untruthful accusations, grand jury proceedings do provide sufficient safety devices. Witnesses are sworn to tell the truth and they are subject to the pains and penalties of perjury if they testify falsely. As stated in State v. DiModica, 1963, 40 N.J. 404, 192 A.2d 825:

> "The grand jury's function as a constitutional safeguard is only to determine whether the evidence placed before it is sufficient to warrant the return of an indictment, so that persons may be protected from being forced to stand trial on unfounded criminal charges. Whether a record is kept of the testimony produced at the grand jury proceeding can have no bearing on the fulfillment of this function, and hence the absence of such a record does not affect the defendant's constitutional right."

▮ Rule 6(d), M.R.Crim.P., which gives an accused bound over after probable cause hearing an opportunity to request for good cause the presence of an official court reporter in the grand jury room, is not violative of the equal protection clause of our Constitutions because it denies that possibility to others who are not accorded preliminary hearings prior to indictment. The contention that this procedure sets up an arbitrary and capricious classification is without merit. See, State v. King, 1936, 135 Me. 5, 188 A. 775.

> "The fact that a statute [here—a rule] discriminates in favor of a certain class does not make it arbitrary, if the discrimination is founded upon a reasonable distinction * * *. Or if any state of facts reasonably can be conceived to sustain it * * *. 'If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.'" State Board of Tax Commissioners of Indiana v. Jackson, 283 U.S. 527, 537, 51 S.Ct. 540, 543, 75 L.Ed., 1248.

> "A classification must not be arbitrary. It must be natural and reasonable * *. It must be based upon an actual difference in the classes bearing some substantial relation to the public purpose sought to be accomplished by the discrimination in rights and burdens * * *. If a classification, though necessarily discriminatory, stands these tests, it is not a denial of equal protection of the laws." York Harbor Village Corporation v. Libby, 1928, 126 Me. 537, 140 A. 382.

The reasons for grand jury secrecy, which the presence of an official court reporter in the grand jury room will for good cause shown under the rule tend to dissipate in whole or in part, may be listed as they appear in United States v. Rose, 1954, 3d Cir., 215 F.2d 617, 628–629:

> "(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt."

Although the secrecy rule may be subject to legitimate criticism in that it may be said to impede on occasion the search

for truth, nevertheless it firmly rests on genuine state interests recognized at the very institution of this protective judicial device. The distinction between the two classes, those who have been held to answer after probable cause has been found and persons who are indicted directly without preliminary hearing, cannot be said to be arbitrary and capricious but merely confirms the original rationale supporting near absolute secrecy. Furthermore, the rule in its application does not deny the person secretly indicted his rights to full cross-examination of trial witnesses respecting their grand jury testimony, to the extent where necessary of having grand jurors themselves disclose it. The defendant's truly novel contention is without merit.

The defendant urges prejudicial error in the use of pretrial identifications. He claims that his in-court identification by the State's two witnesses against him was so tainted by impermissible pretrial photographic viewing procedures as to deny the State's evidence against him the force of proof beyond a reasonable doubt required in all criminal prosecutions. His motion for judgment of acquittal and for new trial, so he says, should have been granted. We disagree.

The evidence at trial disclosed that on November 4, 1969 shortly after 8:00 p. m. two males entered Bosse's Variety Store on South Main Street, in Auburn. The proprietor's wife who was tending the store saw one of them take a gun out of his pocket and she testified that he said: "This is a stick-up; let's have all the bills." While the man was halfway on the counter, at arm's length from her, Mrs. Bosse gave him the money. She did not observe that the other man had also pulled out a gun and was threatening Miss Godin, Mrs. Bosse's friend who was visiting with her at the time. Miss Godin, after hearing the click of a firearm, confirmed seeing and hearing the first robber threatening Mrs. Bosse and saw Mrs. Bosse give him the money at the point of the gun. Both admitted that they were ordered to lie on the floor, which they did, the whole episode lasting no more than five minutes. Following the robbery, Mrs. Bosse described the robber as wearing a three-quarter length dark blue jacket with some "fur or something" on it, with no tie, and as having a dark complexion and dark brown hair. Absent from her description were certain characteristics of the defendant's facial features such as a scar above the right eye, sunken cheeks and a prominent chin and nose. Miss Godin, on the other hand, did alert the police to the intruder's prominent nose.

Some two weeks following the robbery the police showed the two ladies in separate interviews the pictures of three individuals. Both identified the defendant as one of the two men in a glossy picture 8″ by 10″ in dimension. The other photograph was a regular police picture of a third person. The defendant contends that such police tactic was so suggestive to the victim and eyewitness of the robbery and so tainted their in-court identifications of the defendant as to wholly discredit them as a matter of law. The defendant additionally avers the police compounded the error when on the following day the ladies were asked to view a group of 8 or 10 pictures, including the 8″ by 10″ glossy photo of the defendant, at which time they again identified the defendant as the person who robbed Mrs. Bosse.

We note that Mrs. Bosse did not relate to the police a detailed description of what may have been salient facial characteristics of the defendant. Miss Godin, however, did notice and report defendant's prominent nose. The evidence in the record does not divulge the nature and degree of visibility of the defendants's scar over his right eye, nor does the transcript disclose how conspicuous the defendant's alleged sunken cheeks and protruding chin and nose were on November 4, 1969 in the setting of the store on the evening of the robbery. Mrs. Bosse admitted to nervousness on the occasion while Miss Godin stated she feared for her life. Observations made under such

unusual circumstances will vary with people. Both women were positive beyond the possibility of mistake in their in-court identification of the defendant in reliance upon their memory of the event some 3½ months earlier.

We further note that evidence of pretrial photographic identification by the State's witnesses was explored and given in the presence of the jury without objection from defendant's counsel. As a matter of fact, defendant-counsel's strategy at trial seems to indicate acceptance of the evidence of pretrial photographic identification in support of his claim that the State's proof of defendant's involvement in the robbery fell short of the required standard of proof beyond a reasonable doubt.[1]

We acknowledge that photographic identifications may occasionally lead to a misidentification of an accused. This tool of crime detection carries some inherent potential danger. The victim or witness may have made his observations during a very short period of time or under poor conditions, circumstances which always present some degree of unreliability and possibility of an incorrect identification. As stated in Simmons v. United States, 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247,

"[t]his danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons *among which the photograph of a single such individual* recurs or *is in some way emphasized.* * * * Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, *reducing the trustworthiness of subsequent* lineup or *courtroom identification.*" (Emphasis supplied.)

Notwithstanding the hazards involved in the use of photographs for the purpose of identifying persons suspected of criminal activity, the Court in *Simmons,* supra, recognized the great value of this police technique in criminal law enforcement and refused to prohibit its employment as a matter of constitutional requirement.

"Instead, [said the *Simmons* Court] we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

In the instant case, the two State witnesses had viewed, on the night of the robbery, two or three books of police pictures. Their number is not revealed. The defendant's photo was not in the Auburn police file and no identification ensued. Some two weeks later the two women were individually and separately shown one glossy photograph of the defendant and another person, together with a police picture of a third man. This glossy print was 8" by 10" in size. The officer's instructions at the time carried neutral tones of—study the pictures—look at them—take your time in making up your mind. The

1. This appears in counsel's argument upon his motion for acquittal:
"I submit to the Court that the only evidence which the State has introduced as to the Defendant's guilt is the identification made by its witnesses. I feel that the identification has been impaired to the point where, with nothing else introduced as evidence of the Defendant's guilt, that it can't be considered enough to establish the State's case beyond a reasonable doubt. Miss Godin said that the second time she saw a picture of the Defendant, which was the first time she ever saw his picture, was when Officer Bolduc brought them a single 8 by 10 glossy photograph of the Defendant and somebody else. If you look at the picture, it doesn't even look like the Defendant; he was short and fat and everything else. She never was given an opportunity to have her powers of observation tested."

defendant suggests that showing only 3 pictures of possibly suspected persons with himself cast in a photo of greater size than the usual police photograph threw some emphasis on his own person. There is no evidence in the record that the police procedure was anything but an honest effort by the officer, as soon as these additional photographs became available, to determine as promptly as could be done, whether police suspicions against the defendant were well founded. Both witnesses had a good opportunity to observe the robber in the store while the crime was in progress. The pretrial view of the photographs was sufficiently close to the event that the image of the intruder was still fresh in their memory. The witnesses did not know, nor were they told, which of the three persons, if any, were suspected by the police. Under the totality of the circumstances, we cannot say that the particular police procedure was so highly suggestive in character as to subject the State's witnesses to irreversible misidentification. The positiveness of their in-court identification, so it appears from the record, stemmed not from any built-up confidence from prior photographic viewings but rather sprouted from their actual recollection of the person of the defendant as they observed him at the scene of the crime a relatively short time before the trial.

■ The pretrial photographic identification methods used in the instant case, however, are not to be considered as models of ideal criminal law enforcement procedures. The display of a very limited number of pictures—three—and the showing of the photograph of the defendant of a different type and size from the usual police snapshots, even though at the investigatory stage of police work, do raise suspicion of susceptibility to suggestion and present danger of misidentification; convictions based on subsequent in-court identifications, in circumstances little different from the facts of this case, might be jeopardized. On the other hand, the viewing of a single photo, under certain circumstances, may not be un-necessarily conducive to irreparable identification. See, United States v. De Leo, 1970, 1st Cir., 422 F.2d 487.

The duplicate exhibition of photographs on November 17 and 18, seemingly pointless and not recommended, did not cause the viewing to be "impermissively suggestive" because of the repetition. The witnesses' in-court identification was not dependent upon their pretrial photographic observations and under the totality of the circumstances we conclude that their in-court identifications were not tainted by such pretrial police procedure. United States v. Ballard, 1970, 5th Cir., 423 F.2d 127.

The State's witnesses were asked to look at the photograph of the defendant immediately prior to trial and they did so, but there is nothing in the record which even remotely suggests that they were in any way influenced by their view of the picture respecting their subsequent in-court identification. While we disapprove the practice, we hold that the admission of the identification testimony on the record before us did not, in any way, affect the substantial rights of the defendant. No manifest injustice or denial of due process has been made to appear. Davis v. United States, 1970, 9th Cir., 425 F.2d 673; People v. Martin, 1970, 47 Ill.2d 331, 265 N.E.2d 685.

■■ While we rest our conclusion upon the substantive factor that the in-court identifications were properly admitted to support conviction beyond a reasonable doubt and were not the product of tainted pretrial photographic viewings in violation of due process, we point out that the defendant in this case is in a vulnerable position to press his objections, because he failed at trial to object to any of the identification testimony. It has been a long standing procedure in Maine that if a party has an objection to the introduction of evidence at trial he must state the same to the court specifying at the time his grounds for the objection. Rule 51, M.R. Crim.P., gives it the force of law. Where

no objections to the admission of the identification evidence were registered at the trial, the defendant must be deemed to have waived the same. Brine v. State, 1970, Me., 264 A.2d 530, 535. Constitutional rights, like other rights, must be protected at trial within the format of trial procedures and court rules and are subject to recognized principles of waiver. *Brine*, supra. It is only when the evidence complained of admitted without objection is so highly prejudicial and so taints the proceeding as virtually to deprive the aggrieved party of a fair trial that an appellate court may consider the propriety of its admissibility when raised for the first time on appeal. State v. Langley, 1968, Me., 242 A.2d 688; State v. Wheeler, 1969, Me., 252 A.2d 455. The instant case presents no such problem.

The defendant was charged under 17 M.R.S.A. § 3401 with the crime of robbery, in manner as follows:

"On the fourth day of November, 1969, at Auburn, County of Androscoggin, State of Maine, George Alfred Levesque did by putting in fear, take, steal and carry away the property of Richard Bosse d/b/a Bosse's Variety Store, to wit, the sum of one hundred and fifteen dollars ($115.00) in money from the person of Renee Bosse with the intent to permanently deprive the owner of his property."

The reference statute provides:

"Whoever, by force and violence or by putting in fear, feloniously steals and takes from the person of another property that is the subject of larceny is guilty of robbery * * *."

The distinguishing characteristic of robbery from the crime of larceny from the person under 17 M.R.S.A. § 2102 is that the taking must be shown to have been accomplished either by force and violence or by putting in fear. Force or intimidation is the very gist of the crime of robbery. See, State v. Castonguay, 1970, Me., 263 A.2d 727; State v. Greenlaw, 1963, 159 Me. 141, 189 A.2d 370. But these essential ingredients are alternative requirements and it is not necessary that a robbery be accomplished by means of both force and fear as proof of either one is sufficient to sustain a conviction. Both are not necessary to complete the offense. Thoreson v. State, 1940, 69 Okl.Cr. 128, 100 P.2d 896; Waggner v. Commonwealth, 1944, 298 Ky. 153, 182 S.W.2d 661; State v. Sawyer, 1944, 224 N.C. 61, 29 S.E.2d 34; Norris v. United States, 1946, 5th Cir., 152 F.2d 808, cert. denied 328 U.S. 850, 66 S.Ct. 1118, 90 L.Ed. 1623; State v. Van Horn, 1956, Mo., 288 S.W.2d 919; Miller v. State, 1959, 230 Ark. 352, 322 S.W.2d 685.

In robbery prosecutions, the State may allege the taking to have been made either by force and violence or by putting the victim in fear in accord with what the State's evidence may disclose. Either is sufficient to sustain the indictment. State v. Alvis, 1935, 116 W.Va. 326, 180 S.E. 257.

The defendant complains that since the State elected to charge robbery by putting in fear, the robbery verdict was not supported by the evidence. It is true that the victim of the robbery, Mrs. Bosse, did not testify expressly that she was put in fear. Her testimony described the event in this fashion:

"A. Yes. I was talking with that girl and two guys walked in. One of them took out a gun and looked at me and said 'This is a stick-up; let's have all the bills.' So I did; I gave them to him. Then he ordered us to the floor. He said 'Get down on the floor.' We did.

\* \* \* \* \* \*

Q. How close did he come to the counter that you were behind?

A. He was halfway on the counter when I gave him the money.

\* \* \* \* \* \*

Q. How close were you to Man No. 1 when you were standing there handing him the money?

**578**

A. I would say about an arm's distance when I gave it to him.

\* \* \* \* \* \*

Q. What was your reaction when Man No. 1 said 'Stick them up and give me the bills'? Did he have a gun in his hand at that time?

A. Yes, he did.

Q. What was your reaction?

A. I was nervous and I backed up a little bit, but I went forward and I gave him the money. I opened the cash register and I gave him the money.

\* \* \* \* \* \*

[On cross-examination]

Q. And you gave this money to him because he forced you to?

A. Right."

The defendant also complains about the Court's instruction to the jury that—

" \* \* \* the stealing, taking and carrying away by putting in fear must be established by proof of one or more of the acts or statements of the accused which were done or made in such a manner as would produce in the ordinary person fear of bodily harm. However, actual fear need not be proved. It may, like intent, be inferred from the perpetration of an offense such as this, the acts which were done, the situation of the victim, and from all the surrounding circumstances of the case as shown by the evidence."

■ There was no error. Even though Mrs. Bosse did not affirmatively testify that she was in fear, she did not assert that she was not. She admitted that—

"I was nervous and I backed up a little bit, but I went forward and I gave him the money. I opened the cash register and I gave him the money."

The issue is one for the jury. If the taking is attended with such circumstances of ter-ror, such threatening by word or gesture, as in common experience are likely to create an apprehension of danger and induce a person to part with his property for the sake of his person, the victim is put in fear within the meaning of our robbery statute. See, State v. Sawyer, 1944, 224 N.C. 61, 29 S.E.2d 34. Speedy compliance by the victim with the threatening demands of an armed person for money is proof of acquiescence under fear of bodily injury in the event of a refusal to do so. In Ross v. State, 1925, 31 Okl.Cr. 143, 237 P. 469 and Wissinger v. State, 1928, 39 Okl.Cr. 324, 264 P. 631, the jury was permitted to infer fear, notwithstanding the victim's testimonial assertion that he was not afraid of injury. See, also, State v. Ball, 1960, Mo., 339 S.W.2d 783.

■ Mrs. Bosse's affirmative statement that, at the point of the gun, she was nervous and backed up a little bit, supports beyond a reasonable doubt the inference drawn by the jury that under all the existing circumstances she was in fear of bodily injury if she did not comply with the intruder's demands. Not only does the Websterian definition of nervousness include fear, but people generally attribute nervousness to emotional excitation related to divers causes one of which may be fear. Testimony by the other State witness that she was put in fear was a relevant circumstance for the consideration of the jury on this issue. The element of fear being a reasonable inference from the evidence, the facts and circumstances viewed in their totality support and warrant the jury verdict of guilt of robbery beyond a reasonable doubt.

All other points of error raised have been seriously considered and found to be without merit.

The entry will be

Appeal denied.

All Justices concurring.

ARCHIBALD, J., did not participate.