**STATE of Maine**

**v.**

**Bion H. PIKE.**

**STATE of Maine**

**v.**

**Herbert L. PIKE.**

Supreme Judicial Court of Maine.

June 21, 1973.

Joseph E. Brennan, County Atty., Arthur A. Stilphen, Asst. Atty. Gen., Peter Ballou, Asst. County Atty., Portland, for plaintiff.

Basil A. Latty, Craig E. Turner, Yarmouth, for defendants.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

By separate complaint filed in the Ninth District Court, Division of Northern Cumberland, each defendant was charged with having committed, on September 6, 1970, the misdemeanor of "night hunting" in violation of 12 M.R.S.A. § 2455.[1] Each defendant waived reading of the complaint and hearing, pleaded not guilty, was found guilty as charged and sentenced to pay a fine of $200.00. Each appealed to the Superior Court (Cumberland County) and thus became entitled to a trial "de novo." The cases were tried together before a jury, and on September 10, 1970 each defendant was found guilty.

In their appeals to this Court defendants assert common claims of reversible error by the presiding Justice that (1) he was wrong in denying the motion of each

---

1. At the time of the instant events, and as here pertinent, 12 M.R.S.A. § 2455 read:

 "  .   .   ."

 "It shall be unlawful to hunt wild animals from ½ hour after sunset until ½ hour before sunrise of the following morning, except skunks and raccoons, as provided in section 2358. For the purpose of this section, the time shall be that which is recognized as legal in the State of Maine."

defendant for judgment of acquittal, (2) he gave incorrect instructions concerning "circumstantial" evidence in the case and (3) he failed to exclude from evidence particular objects seized in violation of constitutional rights of the defendants under the Fourth-Fourteenth Amendments to the federal Constitution.

We deny each appeal.

The following are facts not in dispute. At approximately 11:00 p. m. on September 6, 1970 an automobile owned by defendant, Herbert L. Pike, and driven by his wife, Claire, turned left from the Sweden Road on to the North Bridgton Road in Bridgton. The vehicle stopped adjacent to an open field surrounded by apple trees. The light of a flashlight came from the automobile (whether while the car was still moving or was stopped being in dispute), and moved about the field for approximately a minute.[2] The car then started in motion and proceeded for another half mile until it finally responded to a blue light signal from the cruiser of two wardens of the Department of Inland Fisheries and Game. After a short interval of discussion the wardens placed each of the defendants under arrest for night hunting.

The parties disagree concerning other aspects of the incident.

The State's evidence, presented primarily by the wardens, was that commencing with 8:00 p. m. on September 6, 1970, the wardens had been engaged in field surveillance on the North Bridgton Road. They had concealed their cruiser in an area of field on which there was high growth of vegetation. They observed an automobile pass their position operated by a woman subsequently ascertained to be Claire Pike. They saw the brake lights come on and the vehicle gradually come to a stop approximately 300 feet down the road opposite a large open field in which the wardens had seen deer on numerous occasions during the immediately preceding month. One warden, Warden Spencer, remained standing on the road and the other, Warden Lewis, ran to the cruiser. Each watched the Pike automobile through field glasses.

Each warden saw the car come to a stop and thereafter a light emanate from inside the car and scan the field for approximately a minute. The car then resumed motion down the road. Warden Lewis immediately swung the cruiser onto the road, picked up Warden Spencer and, with the cruiser's lights off, followed the Pike vehicle for approximately one-half mile. As the automobile went around a sharp left corner, Warden Lewis turned on the headlights of the cruiser and its blue light. Almost immediately, the brake lights of the Pike vehicle came on, but the car kept being maneuvered haltingly, repeatedly stopping and starting over a distance of approximately 110 yards, before it came to a definite stop.

Both wardens went to the front of the vehicle. Warden Lewis took a position on the driver's side, and Warden Spencer was on the passenger's side. Defendant, Herbert L. Pike, was seated on the passenger side of the front seat and defendant, Bion H. Pike, was directly behind him on the rear seat. Two small children were seated in the back seat who appeared to Warden Lewis to have just awakened from sleep.

Warden Lewis read the "Miranda" warning. He then asked whether there were firearms in the vehicle. As he was asking the question and receiving an affirmative answer, he noticed a firearm on the floor in the front of the vehicle. Upon his request, it was delivered to him. It was an unloaded Winchester .351 caliber rifle with an effective range of approximately 100 yards. Normally used with such rifle are short and stubby lead bullets. Although the

2. September 6, 1970 was not within the time of the open season on deer. Merely to illuminate wild birds or deer with an artificial light, therefore, was then lawful since the time was outside the period (the open season on deer) to which 12 M.R.S.A. § 2465, prohibiting such illumination, was applicable.

rifle is generally used with an ammunition clip, the clip is not necessary for firing. In tests which Warden Lewis performed with the rifle he was able to fire it without the clip.

By shining his flashlight into the interior of the automobile, Warden Lewis further observed a dirty-looking five-cell flashlight on the front seat. Upon his demand the flashlight was delivered to him. He observed that it looked as if it had been much used. Examination of it disclosed batteries in it. The warden tested it and found it in proper working order.

Warden Lewis asked if there was ammunition in the car. All three adults answered: "No." Defendant, Herbert Pike, seeking to demonstrate an absence of ammunition, started rummaging about in the glove compartment and shuffling items on the car's dashboard. At this juncture, Warden Spencer noticed two shells on the floor of the vehicle in the immediate vicinity of the right foot of defendant, Herbert Pike. He requested that the shells be delivered to him, and although Herbert Pike hesitated at first, he finally reached down, "picked up two shells from beneath his foot" and passed them out through the window. The shells were appropriate for use in a Winchester .351 caliber rifle. The wardens then placed both Herbert and Bion Pike under arrest for night hunting.

The version of defendants was that the presence of the flashlight, the gun and the ammunition in the automobile was coincidental. They said that they had been visiting a friend in Fryeburg and were returning to their homes in South Waterford.[3] During the trip they had fallen asleep and awoke only when the driver, Claire Pike, addressed them to call to their attention that they were being followed by "police" who were signaling with a blue light.

Claire Pike testified that her son had been playing with the flashlight, lit it by

accident and this led her to stop the automobile to allow her opportunity to take it from him. She said that the rifle happened to be in the car because Herbert Pike usually kept the rifle in his truck but had decided to take it from the truck for fear that it would be stolen. Both defendants, as well as Claire Pike, testified that the five-cell flashlight had been won by Bion Pike at a beano contest the week before, and he had left it unused in the automobile. Finally, it was asserted that the two shells on the floor must have fallen from the glove compartment previously and without having been noticed. Defendants explained that on the night in question the glove compartment was broken because screws to hold it closed were missing, and a large number of papers were on the floor in the vicinity of the glove compartment—having accumulated there as a result of having dropped, from time to time, from the glove compartment.

## 1

To establish reversible error in the denial of their motions for judgments of acquittal, filed at the conclusion of all of the evidence under Rule 29(a) M.R.Crim.P., defendants rely upon State v. McBurnie, 150 Me. 368, 111 A.2d 542 (1955) as controlling.

*McBurnie* is plainly distinguishable. In *McBurnie* the offense of night hunting had been committed by someone but the only evidence purporting to implicate defendant, McBurnie, was that during a chase of two men, a Fish and Game Warden had come upon him lying on the ground in the vicinity. No gun, light or shells were found on the person of the prostrate defendant or anywhere about him. The warden was unable to identify defendant as one of the men he had been chasing. The Court concluded the evidence proved only that the defendant

". . . was in the area at the time the crime was committed, . . ."

---

3. Both wardens testified that if defendants were returning to South Waterford from Fryeburg the route they were taking, to bring them to the area on the North Bridgton Road in which the vehicle had stopped, was more than twice as long as

the usual route to go from Fryeburg to South Waterford. Defendants conceded that they were in fact using a much longer route but claimed that it was a superior road for driving at night.

and whether he

> "may have been night hunting, . . . would be only conjecture." (p. 369, 111 A.2d p. 542)

Significantly closer to the facts here, indeed sufficiently similar to be authoritative, are the cases of State v. Allen, 151 Me. 486, 121 A.2d 342 (1956) and State v. Vicniere, 152 Me. 293, 128 A.2d 851 (1957). In *Allen* and *Vicniere* the "elements" warranting conclusions of guilt in night hunting cases were "catalogued" as: presence of the defendant in time and place relative to the commission of the offense as charged, "night"-time as defined by statute, ready availability to defendant of specific instrumentalities uniquely useful for the accomplishment of the offense and a "purpose to search, find and possess game."

■ Here, as in *Allen* and *Vicniere*, there was evidence of all of these "elements" adequate to support a jury conclusion beyond a reasonable doubt that defendants were guilty of night hunting. That the evidence tends to indicate that defendants might not have committed all of the acts significant in the proof of the offense (such as the shining of the flashlight across the open field) is immaterial. The evidence was sufficient to warrant a conclusion beyond a reasonable doubt that defendants were participants as to some of the "elements"—for example, that defendants knowingly exerted control of the rifle and the shells. Since night hunting is a misdemeanor, anyone who commits an act constituting any part of the ultimate "essentials" of night hunting—notwithstanding that he might not have committed all of the acts necessary to constitute the offense and even though proof is lacking tending to indicate prior planning, or combination, to commit the offense—is nevertheless guilty as a principal. State v. Allen, supra; State v. Vicniere, supra.

## 2

Defendants' second claim on appeal concerns instructions to the jury relative to circumstantial evidence. Defendants made timely objection to an instruction that

> ". . . the State relies, . . ., heavily upon circumstantial evidence to prove the guilt of these Defendants",

and requested that the instructions be modified to inform the jury that the State "relies solely on circumstantial evidence." Instead of giving such requested instruction, the presiding Justice told the jury:

> ". . ., it has been called to my attention that the instructions contain a statement that the State has heavily relied upon circumstantial evidence. Whether it was heavy or otherwise, I would say to you that the evidence here is both direct and circumstantial, . . . ."

Defendants maintain that the refusal of the presiding Justice to characterize the evidence as "solely" circumstantial was error

> "highly prejudicial . . . as it implied that the State's evidence was significantly stronger than the circumstances warranted"

and precluded the jury from being

> "in a position to apply the proper standard [i. e., elimination of every reasonable hypothesis consistent with innocence] to all of the evidence relative to the necessary elements of the offense."

Such argument of defendants is, in effect, an undertaking improperly to transform an instruction often given to Maine juries as a precautionary additional clarification of the meaning of "proof beyond a reasonable doubt"—i. e., that the total evidence can establish guilt "beyond a reasonable doubt" only if, when tested negatively, it excludes all reasonable hypotheses consistent with innocence, see: State v. Allen, 151 Me. 486, 489, 121 A.2d 342, 345 (1956)—into a separate and special independent "standard" of proof operative when the evidence is "solely" circumstantial but not otherwise.

■ Recently, in State v. Tomer, Me., 304 A.2d 80 (1973), footnote 6, we observed that an instruction which purports to single out "circumstantial" evidence for the unique application of the "negative-exclusion" clarification of "proof beyond

a reasonable doubt" is suspect insofar as it tends to

"confuse laymen into supposing that they should use circumstantial evidence otherwise than testimonial." (p. 85)

The implication of the caveat in *Tomer* is that the refusal of a presiding Justice to focus upon circumstantial evidence as uniquely subject to a "negative-exclusion" evaluation may well be an avoidance, rather than the commission, of reversible error. We repeat this warning of *Tomer* for the continuing guidance of the bench and bar although here, as in *Tomer*, we reach no ultimate decision on the general subject.

■ Disposition of the present issue is achieved by decision that the evidence in the instant case was both "testimonial" ("direct") and "circumstantial." The instruction requested by defendants which purported to characterize the evidence as "solely" circumstantial was therefore erroneous, the presiding Justice was without obligation to give it and the instruction actually presented to the jury was correct.

For purposes of a generalized polar-type classification operative in criminal cases, "testimonial" ("direct") evidence, as differentiated from "circumstantial", consists of the testimonial assertions of a competent witness of his perceptional awarenesses of matters constituting an element of the offense charged and which operate as "proof" of such element if believed by the fact-finder. Commonwealth v. Webster, 5 Cush. (Mass.) 295 (1850). "Circumstantial" evidence, in contradistinction, is that which requires not only that the fact-finder believe a witness' testimonial assertions of his perceptional awareness but also that the fact-finder proceed further to draw reasoned inferences, according to the common experience of mankind, in order to achieve "proof" of an element of the offense. 1 Wigmore, Evidence, (3rd Ed., 1940) Section 25, pp. 398–401. See: Casco Bank & Trust Co., and Tomuschat, Appl'ts—In re Will of Christos Dilios, 156 Me. 508, 519, 520, 167 A.2d 571 (1960).

■ As discussed ante, some of the ultimate "elements" to be proved to establish the guilt of the offense of night hunting are: the ready availability to defendant of instrumentalities uniquely utilizable for hunting, the presence of defendant in time and place relationship to the offense and the time of the offense as night rather than day. As to each of these "elements" the evidence here presented was "testimonial" ("direct"), since witnesses had asserted under oath their perceptional awarenesses of these matters and all that was necessary to have "proof" of these "elements" was that the fact-finder believe the witnesses. The presiding Justice was thus correct in his instruction to the jury that some of the evidence was "direct" rather than "circumstantial."

3

■ Patently without merit is the last contention of defendants that the wardens took possession of the five-cell flashlight, the Winchester .351 caliber rifle and the shells by violating the "search and seizure" guarantees of the Fourth-Fourteenth Amendments of the federal Constitution.

We observe, initially, that no motion to suppress was made either before or during trial, and no objection to the admissibility of the objects as evidence was made when they were offered. The issue is raised for the first time on appeal and, hence, notwithstanding that a constitutional violation is asserted, the claim comes too late to be cognizable under principles of sound appellate practice. Rule 51 M.R.Crim.P.; Brine v. State, Me., 264 A.2d 530 (1970); Younie v. State, Me., 281 A.2d 446 (1971); State v. Lavesque, Me., 281 A.2d 570 (1971). In any event, our recent decision in State v. Stone, Me., 294 A.2d 683 (1972) controllingly settles that on its merits the contention of defendants is in error.

The entry in each case is:

Appeal denied.

POMEROY, J., did not sit.