STATE of Maine

v.

Bernest A. YORK, Jr.

STATE of Maine

v.

Charles P. HEALD.

Supreme Judicial Court of Maine.

Aug. 29, 1974.

Arthur C. Hathaway, County Atty., Dover-Foxcroft, for plaintiff.

Stanley W. Brown, Jr., Belfast, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DUFRESNE, Chief Justice.

Bernest A. York, Jr. and Charles P. Heald were separately indicted by the

Grand Jury in and for the County of Piscataquis at the November Term, 1971 of the Superior Court in said County for the crime of attempting to commit a criminal offense,[1] to wit, the offense of breaking and entering with intent to commit larceny.[2] · The fool-proof building involved was the "Some Place Else" restaurant in Greenville, Maine, which the defendants were charged with the attempt to burglarize during the night of October 6, 1971. Their consolidated trial pursuant to Rule 13, M.R.Crim.P. resulted in a guilty verdict against both defendants. York was sentenced to a term of six months in the county jail, while Heald's punishment was imprisonment in Maine State Prison for a term of not less than 1¼ years and not more than 2½ years. Both have appealed to this Court. Their appeals are denied.

Resort to the evidence received at the hearing on the defendants' motion to suppress and at the trial must be detailed to some extent in order to analyze and resolve the contentions and issues raised by the multiple points on appeal.

The "Some Place Else" restaurant is situated in Greenville, Maine at the intersection of Pritham Avenue and Dorr Street. Pritham Avenue runs in an east-west direction and Dorr Street is a dead-end street running northerly from Pritham. The restaurant occupies the northwest corner of the intersection and has an east-side entrance on Dorr Street and a south-side entry-way on Pritham Avenue.

Raymond A. Manske and his wife, Marion, owned the restaurant and its contents. On October 3, 1971 they had closed it, locked all the doors and left the premises in the care of Mrs. Alice Tracy, who, during the afternoon of October 6, 1971 had inspected the place. She testified the doors of the restaurant were then locked, the glass on the east-side door was intact and the hasp thereon was firmly attached.

At approximately 11 p. m. that evening, Cindy Breton, a young lady in her teens who lived on the east side of Dorr Street and had just gotten into bed for the night, first heard a "hitting" noise, followed by the sound of breaking and ·falling glass. This sonic disturbance, she testified, came from the back end of the restaurant. From her second-floor bedroom window she saw a figure cross Dorr Street diagonally from the "back" or north side of the restaurant. Cindy's father, Adrien Breton, on her summons joined his daughter at the bedroom window where both observed the figure make a quick return across Dorr Street to the area behind the restaurant. They then observed another figure standing near a propane gas tank to the rear of the building. At this point Mr. Breton left the room to telephone Marvin Jones, a State Trooper, who lived in the vicinity, advising him of his observations. Returning to the bedroom window, Mr. Breton resumed his "first base bleacher seat." Both witnesses then saw the two figures emerge from the rear of the restaurant and proceed northerly in the middle of Dorr Street past the Breton residence. Cindy described their gait as "faster than a normal walk."

While proceeding northerly on Dorr Street the two figures passed beneath a street light. The Bretons then observed the individuals were both male. Miss Breton thought she saw their faces clearly enough to recognize them later, but she

---

1. 17 M.R.S.A. § 251.

"Whoever attempts to commit an offense and does anything towards it, but fails or is interrupted or is prevented in its execution, where no punishment is expressly provided for such attempt, shall . . . receive the same kind of punishment that might have been inflicted if the offense attempted had been committed, but not exceeding ½ thereof."

2. 17 M.R.S.A. § 754.

"Whoever, with intent to commit a felony or any larceny, . . . breaks and enters any office, bank, shop, store, warehouse, vessel, railroad car of any kind, motor vehicle, aircraft, house trailer, or building in which valuable things are kept, . . . shall be punished . . . by imprisonment for not more than 5 years or by a fine of not more than $500."

was unable to do so. She did, however, testify that one had darker hair than the other, one wore light colored pants and a green field jacket or shirt, and both had red gloves on. In his description of the two men on the witness stand, Mr. Breton said that one was taller than the other, both wore red gloves, but no hat, and they were dressed in light colored pants, but darker jackets. He stated that the taller of the two had what he described as a "lantern jaw."[3]

As the two men proceeded north on Dorr Street, they disappeared from the Bretons' line of vision. Within a matter of "minutes or seconds" a car appeared on Dorr Street from the direction in which the two men had been going. The vehicle at first was traveling without lights, but they were turned on as the automobile passed the Breton house. Mr. Breton observed that the car was dark green and had a peculiar taillight configuration with two lights on either side, one above the other. He furnished this information to Trooper Jones shortly thereafter, with the disclosure that the make of the car was a Ford. He further noticed as the automobile was passing by the house under the illumination provided by the street light that the driver of the vehicle was wearing a dark "army type" field or fatigue jacket and pants of a lighter color of the same hue as those worn by one of the men who had just previously walked up Dorr Street.

Both witnesses saw the green Ford sedan make a left turn from Dorr Street onto Pritham Avenue and proceed easterly towards Greenville Village.

Within minutes Trooper Jones arrived at the scene and went directly to the restaurant. He found the outer screen door of the east-side entrance partially open, the pane of glass nearest to the doorknob on the inner door broken, and glass on the floor inside the restaurant. A safety hasp and padlock on the inner door had been separated from the door casing. The hinged part of the hasp, ordinarily attached to the door casing, contained four screws which were no longer affixed to the frame of the door.

Mr. Breton joined the officer at the restaurant and fully related to him what he and his daughter had witnessed. It does not appear from this record, however, that he then disclosed to the law man the noteworthy facial characteristic of one of the individuals, his "lantern jaw."

The officer then returned to his vehicle. He stated that this was approximately eight to ten minutes after Mr. Breton had called him on the phone. Joined by Deputy Sheriff John Owens as he was proceeding towards the village, the State Trooper continued on easterly on Pritham Avenue.

Less than one mile from the "Some Place Else" restaurant, Officer Jones observed the taillights of a car flashing on and off in the area behind what is described in the record as Pickett's Garage. Because the garage was closed and the streets of the village were otherwise vacant, the trooper drove into the area behind the garage to investigate what was going on. There, he saw a green Ford with two vertically aligned taillights on either side of the vehicle. He noted that the car contained two male occupants, one taller than the other.

In response to Officer Jones' inquiry, the man in the driver's seat identified himself as the defendant Heald. The person on the passenger side was the defendant York. The officer testified that York was wearing an army fatigue jacket and light khaki or "suntan" pants. He could not recall Heald's attire. The two men stepped out of the car when the trooper asked them to do so. As he alighted, the defendant Heald left open the door on the driver's side of the automobile. Through the open door, the officer observed on the

---

3. This feature of Mr. Breton's identification was not disclosed by him, so far as the instant record is concerned, prior to the viewing of the defendants at Pickett's Garage.

front seat a screwdriver which he described as being heavier than the ordinary household type and having a six-inch blade. He then placed the defendants under arrest, seized the screwdriver, reached under the front seat and found two pairs of red gloves which he also seized.

Shortly thereafter, Mr. Breton came to Pickett's Garage in response to a telephone call from police headquarters in Augusta. When he arrived, the defendants were still standing beside the green Ford with their hands on the vehicle. Mr. Breton was asked if he had earlier seen these two men or the vehicle. He identified the car and answered that he could identify the defendant Heald by his "lantern jaw." He later testified that he also relied on Heald's hairline and "slicked back" hair style, although the record does not indicate whether he mentioned these latter features at the out-of-court show-up. He was unable, however, to make a positive facial identification of York.

Prior to their trial, the defendants unsuccessfully filed a motion to dismiss their indictments and a motion to suppress the red gloves and screwdriver. At trial, the screwdriver was admitted over the objection that it was irrelevant and immaterial, the gloves over the "same objection" and the additional argument that they were the product of an illegal search and seizure.

Without objection, Mr. Breton made an in-court identification of Heald as one of the men he had seen near the restaurant. The Court ruled that there was no positive identification of York, but, over objection, Mr. Breton was allowed to say that York was with Heald at Pickett's Garage. The only grounds articulated in support of the objection were relevance and materiality.

The defendants have now formalized their points on appeal as follows: 1) it was error to deny their motion to suppress, and error to admit the gloves and screwdriver, because there was no probable cause for an arrest or search, the search was not incident to a valid arrest, and the plain view doctrine is inapplicable; 2) it was error to deny their motion to dismiss the indictments; 3) it was error to admit hearsay testimony (unspecified) of Officer Jones; 4) it was error to allow the in-court identification by Mr. Breton, because it was tainted by the out-of-court show-up which, defendants argue, violated their right to counsel and was so "dangerously suggestive" as to deprive them of due process of law; 5) it was error to deny their motion for acquittal at the close of the State's case; and finally, 6) it was error to deny their motion for a jury view.

## I. MOTION TO SUPPRESS

■ It is a basic principle of constitutional law that evidence revealed by a search incident to arrest is not to be suppressed. State v. Heald, Me.1973, 314 A. 2d 820; State v. Smith, Me.1971, 277 A.2d 481. See also, State v. Hawkins, Me.1970, 261 A.2d 255.

Search and seizure incident to a valid arrest has long been recognized as a necessary procedural step in law enforcement and has generally been accepted as an important principle of criminal law. State v. Warner, Me.1967, 237 A.2d 150.

■ In order to be sustained as a valid search incident to a lawful arrest, the search, however, must be reasonable; it must not be too remote in time and place from the arrest, and must be confined to those areas into which an arrestee might reach to obtain weapons or to destroy or conceal evidence. Preston v. United States, 1964, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777; Chimel v. California, 1969, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. Indeed, the rationale underlying the validity of searches incident to, and contemporaneous with, lawful arrests stems from the need to seize weapons and other things on the accused's person or under his immediate control which might be

used to assault an officer or effect an escape or to prevent the destruction of evidence of the crime.

■ When the arrest justifying the search is made without a warrant, as in the present case involving a felony, the arrest itself must be based upon probable cause. State v. Heald, supra; State v. Smith, supra. Compare, State v. Hawkins, supra.

■ The existence or non-existence of probable cause depends upon the facts of each case. As we observed in State v. Smith, supra, 277 A.2d at 488:

> "Probable cause exists where the facts and circumstances within the knowledge of the officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent and cautious man in believing that the arrested person had committed or was committing the felonious offense."

The standard to be met is probability, not proof sufficient to establish guilt, and such a standard must necessarily anticipate and accept reasonable mistakes. State v. Littlefield, 1965, 161 Me. 415, at 419, 213 A.2d 431, at 433; State v. Heald, supra, 314 A. 2d at 825.

■ Applying this standard to the present facts, we hold that Officer Jones was fully warranted in arresting the defendants. The chain of events leading up to the arrest reveals several significant factors which collectively operated to provide the essence of probable cause, i. e. "reasonable ground for belief of guilt." State v. Littlefield, supra.

Here, there was an eyewitness report of an attempted burglary, confirmed by the officer's independent investigation. The only two individuals at the scene of the crime were spotted acting furtively behind the restaurant, and one inexplicably fled the restaurant and then returned. Thereafter, both departed towards the north along a dead-end street. Subsequently, the witnesses to their nocturnal frolic described the law-breakers in detail, particularly their clothing, relative heights, and hair. An equally specific description was furnished with respect to the only vehicle seen on this dead-end street, a vehicle which came from the direction in which the suspects fled moments after their departure, a vehicle which quite suspiciously was being operated without lights and by a person wearing clothing identical to that worn by one of the suspects.

Officer Jones, who from the time of the alert had seen no other moving vehicle at that hour of this October night in the sparsely populated village of Greenville, had justifiable reason to be apprehensive when he encountered on the pursuit route the flashing of automobile lights to the rear of a garage which he knew was closed for the night and, from his experience in police detection activity, when these flashing taillights turned out to be of the odd style which the eyewitness had observed on the escaping vehicle and the two occupants therein matched the description of the suspects, he had probable cause to believe that they were the persons who shortly prior thereto had attempted to burglarize the "Some Place Else" restaurant. Under such circumstance, he was legally warranted in arresting them. Chambers v. Maroney, 1970, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (car and clothing of occupants identical to that seen by observers of the fleeing vehicle; auto located two miles from scene within one hour; *probable cause for search and arrest*); State v. Heald, supra; see also, State v. Mimmovich, Me.1971, 284 A.2d 282.

■ Given the legality of the arrest, the gloves and screwdriver were properly seized incident thereto. Both defendants were then standing beside the vehicle and it does not appear that either had been handcuffed. The search did not extend beyond the front seat of the vehicle and thus clearly did not encompass any area

beyond the conceivable control of the arrestees. State v. Heald, supra, 314 A.2d at 827. The gloves and screwdriver were properly admitted.[4]

## II. MOTION TO DISMISS INDICTMENTS

■ In the court below both defendants moved to dismiss their respective indictment on the ground that neither stated facts sufficient to constitute an offense against the State of Maine.

The indictments in pertinent part read as follows:

"That, on or about the sixth day of October 1971, in the Town of Greenville, County of Piscataquis, and State of Maine, the above named defendant, Bernest A. York, Jr., [Charles P. Heald] did feloniously attempt to commit a criminal offense, to wit, then and there in the nighttime of said day, the restaurant of one Marion E. Manske and one Raymond A. Manske, there situate, being a building where valuable things are kept, feloniously did attempt to break and enter with intent the property of said Marion E. Manske and Raymond A. Manske in said building then and there being, feloniously to steal, take and carry away, and, in such attempt, did then and there do a certain overt act toward the commission of said offense, to wit, by breaking a window in a door to said building and using force on a safety hasp on the frame of said door, but he, the said Bernest A. York, Jr., [Charles P. Heald] then and there failed, was interrupted and prevented in the execution of said criminal offense, against the peace of said State, and in violation of Title 17, Section 251, M.R.S.A."

The reference indictment strictly followed the tested forms provided in Whitehouse and Hill, 1912, Directions and Forms, Criminal Procedure, Maine, at pages 60 and 74, and complied fully with the rule espoused in State v. Doran, 1904, 99 Me. 329, 59 A. 440, 105 Am.St.Rep. 278 that an indictment charging an attempt to commit a criminal offense must contain a description of the overt act done by the accused in attempting to commit the intended crime and also must specify the ultimate offense which he is charged with attempting to commit. See also, Duncan v. State, 1962, 158 Me. 265, 183 A.2d 209, cert. den., 371 U.S. 867, 83 S.Ct. 129, 9 L.Ed.2d 104. This point on appeal is unmeritorious.

## III. IDENTIFICATION TESTIMONY

If we were to confine our review to the identification issues argued by defendants, even though not preserved for review by objection in the court below, we would have no difficulty in concluding that the in-court identification of Heald is directly governed by our decision in State v. Carlson, Me.1973, 308 A.2d 294. In *Carlson,* a rape victim identified the defendant at trial as her attacker without objection. On appeal Carlson contended that the in-court identification should have been excluded as the product of a tainted pre-trial cell block confrontation. Noting the absence of any prior objection, we re-stated the now familiar rule that the identification issue is

---

4. On appeal, the defendants have apparently abandoned their argument that these exhibits were irrelevant and immaterial. The argument, in any event, would be without merit. The red gloves were properly admissible as circumstantial evidence on the issue of identification, since the suspects seen fleeing the scene of the crime both wore red gloves. State v. Galloway, Me.1968, 247 A.2d 104, 106. The screwdriver was a tool well-suited for the crime in question and "the fact that the accused had a weapon or implement suitable to the commission of the crime charged, such as a knife, revolver, *burglars' tools,* or inflammable material, is always a proper ingredient of the case for the prosecution." 1 Wharton's Criminal Evidence, (13th ed.), § 157 at 289–290. (Emphasis added). See, State v. Crawford, 1921, 59 Utah 39, 201 P. 1030, at 1032; Phillips v. State, 1953, 157 Neb. 419, 59 N.W.2d 598, at 600; State v. Roche, 1969, 104 Ariz. 276, 451 P.2d 605, at 606–607.

considered waived unless " 'the evidence complained of admitted without objection is so highly prejudicial and so taints the proceeding as virtually to deprive the aggrieved party of a fair trial.' " Id. at 296–297, quoting State v. Levesque, Me. 1971, 281 A.2d 570, 577.

In *Carlson,* we found no such error, since the evidence clearly indicated an independent source for the in-court identification, even if the pre-trial confrontation was defective, a question not resolved by our decision.

In the present case the presiding Justice carefully questioned Mr. Breton as to the source of his ability to identify Heald. The witness responded firmly and unhesitatingly that he could identify Heald from the impression created in his mind by having seen the defendant at the scene of the crime. In ruling on the admissibility of the evidence the presiding Justice, although not reciting the phrase "independent source," decided to admit the testimony because its source was the witness's present memory of his observations at the scene of the crime and not the subsequent viewing at Pickett's Garage. The only reasonable interpretation of the Justice's ruling and his comments in connection therewith is that he was satisfied the identification of Heald stemmed from a source other than, and independent of, the allegedly unconstitutional confrontation. Compare State v. Rowe, Me.1974, 314 A.2d 407, 414–415.

Here, there is ample evidence to support a finding of an independent source. Many of the factors outlined in State v. Rowe, supra, are present in the circumstances surrounding the identification at issue; the witness had an extended opportunity to view the would-be burglar at the time of the commission of the crime under adequate lighting; the identification was fresh, spontaneous and positive; the description originally given, including that of the vehicle, conformed precisely to the actual appearance of the defendants and their car; there had been no identification

of any other suspects which might tend to detract from the reliability of the identification in question. Heald's so-called "lantern jaw" apparently was a characteristic so distinctive that it created an indelible impression in the mind of the witness which enabled him instantly to identify Heald at Pickett's Garage as the man he had previously observed.

It is also significant that, despite whatever suggestiveness there may have been in the initial confrontation, the witness admitted quite frankly at trial that he could not make a facial identification of York. If in fact the witness's in-court identification had been inspired by the showup and not by factors independent thereof, it would logically be expected that he would be tempted to identify *both* defendants. If such temptation existed, it was temptation to which the witness did not succumb. There is absolutely no indication that his ability to identify Heald was to any extent influenced by the out-of-court confrontation.

■ In the present case, however, we cannot simply conclude our discussion of the issue by holding that there was an independent source underlining the in-court identification without addressing the constitutionality of the pre-trial confrontation itself. Although the specific point was not made below, and indeed has not been raised by the appellants in this Court, we cannot help but notice that, during the course of the trial, evidence of the pre-trial confrontation and prior identification was presented in detail in the presence of the jury. Under the circumstances, since we cannot assume that the effect of this testimony on the jurors was negligible, we believe the interests of justice would best be served by a full review of the matter. See, State v. Boyd, Me.1972, 294 A.2d 459, 462, 464.

■ A review of our prior decisions reveals two types of cases dealing with the issue of identification testimony. In one

group are the cases which dealt with the use of one-way mirrors or with identification techniques bearing so many attributes of the one-way mirror as to be virtually indistinguishable therefrom. State v. Barlow, Me.1974, 320 A.2d 895; State v. Rowe, Me.1974, 314 A.2d 407; State v. Northup, Me.1973, 303 A.2d 1; State v. Boyd, Me.1972, 294 A.2d 459; State v. LeBlanc, Me.1972, 290 A.2d 193. In the other category are those cases which dealt with lineups or showups otherwise alleged to have been impermissibly suggestive although not involving the use of a one-way mirror. State v. Carlson, Me.1973, 308 A.2d 294; State v. Emery, Me.1973, 304 A.2d 908; Trask v. State, Me.1968, 247 A.2d 114 (see also, Trask v. Robbins, 1st Cir. 1970, 421 F.2d 773); State v. Galloway, Me.1968, 247 A.2d 104. For present purposes, we may include within the second grouping cases dealing solely with pre-trial photographic identifications. State v. Niemszyk, Me.1973, 303 A.2d 105, cert. denied, 414 U.S. 1042, 94 S.Ct. 544, 38 L.Ed.2d 333; State v. Levesque, Me.1971, 281 A.2d 570.

In developing this body of law we have repeatedly alluded to the decisions of the United States Supreme Court to ascertain the standard by which a claimed due process violation is to be judged. See, Stovall v. Denno, 1967, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199; Simmons v. United States, 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247; Foster v. California, 1969, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402; Coleman v. Alabama, 1970, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387.

As stated in *Stovall,* the accused is entitled to relief when the confrontation is "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny him due process of law. 388 U.S. at 302, 87 S.Ct. at 1972. Obviously, the test is a relative one which must take into consideration the extent to which some suggestiveness may necessarily be inferred and the likelihood that such suggestiveness will result in misidentification. No one factor is determinative, and, as *Stovall* itself makes clear, the mere fact that the suspect is shown singly is not controlling. As the Court there noted, this practice is subject to criticism. "However," the Court added, "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it . . ." 388 U.S. at 302, 87 S.Ct. at 1972. In *Stovall,* a one-on-one confrontation was upheld even though suggestive, because, on the facts of that case, such a viewing was imperative.

In *Simmons,* the Court again stated the rule to be that a conviction will be overturned only where the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971. From the totality of the circumstances, the Court found no violation in *Simmons,* although there were elements of suggestiveness in the photographic display, because: "[T]here was in the circumstances of this case little chance that the procedure utilized led to misidentification . . . ." 390 U.S. at 385, 88 S.Ct. at 971.

In Foster v. California, supra, the totality of the circumstances did reveal pre-trial identification techniques "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to offend due process. In *Foster,* the Court emphasized not merely the suggestiveness, but also, the likelihood of misidentification resulting therefrom. Unlike the situation in *Simmons,* the totality of the circumstances in *Foster* indicated such a degree of suggestiveness as would inevitably induce the witness to identify the person exhibited as the criminal, even if he was not. 394 U.S. 440, 89 S.Ct. 1129.

In Coleman v. Alabama, supra, the Court again applied the totality test and held that the source of the identification testimony there involved was not a confrontation so impermissibly suggestive as to give rise to

a very substantial likelihood of misidentification.

This reading of the cases is fully supported by the Court's own analysis in Neil v. Biggers, 1972, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401. In *Biggers*, the Court held admissible evidence of an out-of-court showup and identification on the grounds that the totality of the circumstances indicated that *no likelihood of misidentification* resulted from the admittedly suggestive viewing.

Recently, in State v. Rowe, supra, 314 A.2d at 414, n. 1, we found it unnecessary to discuss the applicability of *Biggers* to a case wherein the State had not attempted to introduce evidence of a pre-trial identification made by a witness at a one-way mirror viewing. At the same time, however, we did hold, with respect to evidence of a prior photographic identification which had been introduced by the prosecution, that "Nothing in *this* procedure was so highly suggestive in character *as to subject the witness to the likelihood of making irreparable misidentification.*" 314 A.2d at 412 (Emphasis added). But, with respect to the one-way mirror identification, we went on to say that the State may not introduce evidence of that viewing, and we so held *without regard to the impact which the confrontation may have had on the witness.* See, 314 A.2d at 413–414. To the extent that *Rowe* excluded evidence of a one-way mirror identification without examining its propensity to result in misidentification within the context of that case, it is simply another instance in which we have demonstrated our firm and consistent disapproval of the use of that identification procedure. In our cases dealing with the one-way mirror we have found due process to have been violated for reasons in addition to inherent suggestiveness. A reading of these cases will readily show that our objections were directed as much, if not more so, to the secretive nature of such viewings as they were to their suggestive potential. See, e. g., State v. Boyd, supra, 294 A.2d at 463–464.

■ In other contexts, however, where the due process issue is generated by identification procedures other than the one-way mirror, and where the question is purely one of suggestiveness, it has always been the rule that relief may be granted only when the confrontation is unnecessarily suggestive *and* conducive to irreparable misidentification, based on the totality of the circumstances. See, State v. Galloway, supra, 247 A.2d at 107–108 (necessarily implied by citing *Stovall* and referring to its "totality" test) Trask v. State, supra, 247 A.2d at 117; State v. Levesque, *supra*, 281 A.2d at 576; State v. Emery, supra, 304 A.2d at 913–914.[5]

In the present case, therefore, we must analyze the totality of the circumstances for suggestiveness in the out-of-court confrontation and determine the extent to which such suggestiveness may have induced the witness to misidentify. Utilizing this test, we are convinced, as was the Supreme Court in *Simmons,* that the out-of-court confrontation here was quite unlikely to lead to misidentification. In *Simmons,* the Court was able to point to several factors analogous to those which we summarized previously in discussing the independent source for Mr. Breton's identification testimony (e. g. lighting conditions, witness's opportunity to observe, firmness and consistency of testimony). In view of such factors, the Court found no likelihood

5. As previously noted, *Carlson* did not address the out-of-court confrontation itself in view of the fact that there had been no objection in the court below and, as far as appears from the opinion, no attempt to introduce evidence of the pre-trial show-up. In *Niemszyk*, the defendant did not object to the in-court identifications and the State made no attempt to introduce evidence of the pre-trial photographic identification. Such evidence was first elicited by the defendant on cross-examination. While the opinion in *Niemszyk* does not quote the due process standard as articulated in *Stovall* and *Simmons*, it is clear that no other standard was applied since the Court cited both cases in its analysis of the issue. 303 A.2d at 111.

of misidentification. In particular, two of the factors discussed by the Court are deserving of more extended discussion with respect to the present facts. Here, as in Simmons, the confrontation took place soon after the crime itself while the witness's memory was "still fresh." 390 U.S. at 385, 88 S.Ct. at 972. Here also, the identifying witness did not yield to the temptation arguably created by the suggestive nature of the confrontation, i. e. the temptation to identify York along with Heald. If the identification procedure was suggestive, it was as suggestive with respect to York as it was to Heald. Yet, in York's case, it is clear that the suggestiveness was conducive to no identification at all, much less to irreparable misidentification. In Heald's case, this observation, together with all other relevant factors, leads us to conclude that the suggestiveness of the confrontation had no bearing on the identification made by the witness. Another witness might perhaps have been influenced by the suggestive stimulus, but the witness in question has adequately demonstrated that he was not acting in response to suggestiveness. The suggestiveness bore no causal relationship to the identification, and thus it cannot be said that it was so suggestive as to be conducive to misidentification.

■ The fact that the confrontation occurred within fifteen minutes of the crime is also highly significant. As then Judge Burger once stated in the frequently cited case of Bates v. United States, 1968, 132 U.S.App.D.C. 36, 405 F.2d 1104:

"There is no prohibition against a viewing of a suspect alone in what is called a 'one-man showup' when this occurs near the time of the alleged criminal act; *such a course does not tend to bring about misidentification* but rather tends under some circumstances to insure accuracy." 405 F. 2d at 1106 (Emphasis added, footnote omitted). Where, as in the present case, the confrontation takes place within minutes of the crime, it is generally agreed that the probability of accuracy resulting from such an immediate identification outweighs and offsets any likelihood of misidentification arising out of the inherent suggestiveness of the one-man viewing. Stanley v. Cox, 4th Cir., 1973, 486 F.2d 48; United States ex rel. Gomes v. New Jersey, 3rd Cir., 1972, 464 F.2d 686; Russell v. United States, 1969, 133 U.S.App.D.C. 77, 408 F.2d 1280, cert. denied, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245; State v. Salcido, 1973, 109 Ariz. 380, 509 P.2d 1027; Dillard v. State, 1971, 257 Ind. 282, 274 N.E.2d 387; Davis v. State, 1971, 13 Md.App. 394, 283 A.2d 432; Commonwealth v. Denault, Mass.1972, 289 N.E.2d 863; People v. Martin, 1972, 39 A.D.2d 558, 331 N.Y.S.2d 952; State v. Iron Shell, 1971, 86 S.D. 100, 191 N.W.2d 803.

■ We have carefully reviewed the totality of the circumstances surrounding the identification at Pickett's Garage, and we are convinced that this showup violated neither defendant's right to due process.[6] We therefore find no error in connection with the admission of evidence of both the out-of-court and in-court identifications.[7]

---

6. We consider it unnecessary to review at length appellants' additional argument that this pre-indictment showup also violated their right to counsel. The argument is foreclosed by our prior decisions. *E. g.* State v. Rowe, Me.1974, 314 A.2d 407, 412.

7. It is no longer argued on behalf of the defendant York that evidence of his presence at Pickett's Garage was irrelevant and immaterial. We treat the objection as waived. The objection was directed only to the testimony of Mr. Breton, but we observe also that Officer Jones testified to the same fact without objection and the defendants themselves conceded that they were found together at the garage. Counsel for York requested and received an instruction cautioning the jury to remember that York had not been positively identified by direct evidence as one of the persons seen at the restaurant.

Lest there be any doubt as to the correctness of the ruling, however, we note that the evidence was circumstantially relevant to establish York's identity as the person who had been with Heald at the scene of the crime. Identification may be established by circumstantial evidence, State v. Hamil-

## IV. SUFFICIENCY OF THE EVIDENCE

 The appellants next argue "That the Court below erred in refusing to grant respondents' motion for judgment of acquittal *at the conclusion of the State's evidence . . . ." [8]* (Emphasis added). The record before us does indicate that counsel for the defendants moved for judgment of acquittal after the State had rested. Following a conference in chambers, the motion was denied. Thereafter, the defendants proceeded to introduce additional evidence after which they too rested. The record does not show that they subsequently renewed their motion for judgment of acquittal at the close of *all* the evidence. In such cases, we have repeatedly held, and we again hold, that the failure to renew the motion at the close of all the evidence operates as a waiver of the prior motion and precludes appellate review. *E. g.,* State v. Sawyer, Me.1974, 314 A.2d 830; State v. Cedre, Me.1974, 314 A.2d 790; State v. Gamage, Me.1973, 301 A.2d 347.

 As has been our practice in such cases, we have, nevertheless, reviewed the record for obvious prejudicial error under Rule 52(b), M.R.Crim.P., and we are of the opinion that the evidence was sufficient for the jury to conclude beyond a reasonable doubt that York and Heald were guilty as charged. The fact that York was placed at the scene of the crime only by inference drawn from circumstantial evidence does not as a matter of law render the evidence insufficient. State v. Mimmovich, Me.1971, 284 A.2d 282. The same is true with respect to the defendants' argument that there was no direct evidence to establish that either defendant actually broke the glass on the door, or that they did so with a larcenous intent. Their identity as the perpetrators of the crime and the intent to commit larceny may be inferred from circumstantial evidence. See, State v. Mimmovich, supra; State v. Liberty, Me.1971, 280 A.2d 805; State v. Hamilton, 1953, 149 Me. 218, 100 A.2d 234. Here, there was direct evidence to establish that Heald and another man, acting together, were the only two individuals present at the time the burglary was attempted. The evidence thus shows more than the "mere" opportunity to commit the crime; it shows that these two men alone had that opportunity. See, State v. Lerman, Me.1973, 302 A.2d 572. · See also, State v. Liberty, supra. There was additional evidence from which the jury could conclude that the man found with Heald minutes later at Pickett's Garage, identified as York, was the man who had earlier been with Heald at the restaurant. State v. Mimmovich, supra. There was no error in allowing the case to go to the jury.

 Appellants' remaining arguments may be considered summarily, since they are essentially without merit. The motion for a jury view was addressed to the sound

ton, 1953, 149 Me. 218, 100 A.2d 234, and evidence which tends to establish identity independently or together with other evidence is admissible. State v. Hamilton, supra; see, State v. Wagner, 1873, 61 Me. 178. In the instant case, there was additional evidence to show that York wore clothing identical to that worn by one of the suspects and that he was of the same relative size and shape. Such evidence was also relevant to the issue of identity and the evidence establishing this similarity emphasizes the importance of the additional evidence establishing York's whereabouts immediately after the crime. See, 1 Wharton's Criminal Evidence, (13th ed.), §§ 157 (at 290), 186, 188, 191.

8. In separate arguments, the defendants also contend that the verdict is "contrary to the weight of the evidence," and "not supported by substantial evidence." Such arguments constitute only a different way of phrasing the same issue. The issue in each instance is precisely the same as that presented by a motion for judgment of acquittal and the only question before the Court is, whether, in view of all the testimony the jury was justified in believing beyond a reasonable doubt that the defendants were guilty as charged. See, State v. Cedre, Me.1974, 314 A.2d 790; State v. Collins, Me.1972, 297 A.2d 620, 637; State v. Liberty, Me.1971, 280 A.2d 805, 806–807; State v. Wright, 1929, 128 Me. 404, 148 A. 141.

discretion of the trial justice. State v. White, Me.1972, 285 A.2d 832, 835. The scene of the crime was adequately described for the jury and they had before them a diagram which described the various distances and angles of view. Additionally, the defendants themselves were able to introduce photographs which, according to the witness through whom they were introduced, fairly depicted the area which the defendants desired the jury to see. The defendants have demonstrated neither an abuse of discretion in, nor prejudice resulting from, the denial of the request for a view.

■ The argument that the Court erred in admitting hearsay evidence states simply that "the record is filled with numerous hearsay comments by Officer Jones." The argument "does not identify the areas of aggrievement and such blanket designation is insufficient to require review, absent an exceptional case." State v. Poulin, Me.1970, 268 A.2d 475, 479. We hasten to add that the present case is not in this respect an exceptional one. Any evidence given by Officer Jones at trial which might arguably be called hearsay was fully confirmed by the witnesses who actually saw and heard the facts in issue.

These witnesses testified at the trial and were cross-examined at length by counsel for the defendants. Moreover, we note that on at least one occasion the defendants objected to certain evidence as hearsay where the purpose of the extrajudicial declaration was not to establish the truth of the matter asserted, but rather to show the information upon which Officer Jones acted in arresting the appellants. Thus, without further specification of the testimony now challenged, we are not in a position to say with any certainty whether the evidence of which appellants now complain was technically hearsay at all. As we held in State v. Galloway, Me.1968, 247 A.2d 104:

> "[T]he reviewing Court can hardly be expected to find unidentified error without any indication as to its location. Where neither the briefs nor the points of appeal inform the Court either by quotation from or reference to the record, the point must be treated as waived." 247 A.2d at 107.

The entry will be

Appeals denied.

All Justices concur.