**STATE of Maine**

v.

**Ronald ST. ONGE.**

Supreme Judicial Court of Maine.

Oct. 18, 1978.

Michael D. Seitzinger, Asst. Atty. Gen. (orally), Augusta, Frank F. Harding, Dist. Atty., Rockland, for plaintiff.

Edward B. Miller (orally), Rockland, for defendant.

Before McKUSICK, C. J., and POMER-OY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

NICHOLS, Justice.

The Defendant, Ronald St. Onge, was found guilty by a Superior Court jury in Knox County of robbery,[1] and has appealed from the judgment of conviction to this Court.

We deny the appeal.

Again we are confronted by a challenge to pre-trial and in-court identifications. Here our task is not to develop rules of law; rather, it is the formidable task of applying rules of law already enunciated to the unique facts of this case.

During the evening of March 14, 1977, James Jenkins and his wife attended the Owl's Head town meeting. Driving home at approximately 9:25 P.M., they noticed, but paid little attention to, an individual walking along the road about two hundred yards from their house. Reaching home, Jenkins pulled into the driveway and waited in the automobile to drive the babysitter home, while Mrs. Jenkins went inside their house. A few minutes later, as Jenkins and the babysitter backed out of the driveway, the headlights of his automobile fell briefly upon the same individual who had previously been observed. Now, however, the individual was standing behind a tree on Jenkins' property, holding a rifle, and with a bandanna covering his nose and mouth. Jenkins drove back into the driveway. Emerging from his automobile, he was confronted by the masked man who had in the meantime run across the front lawn to a point four or five feet from Jenkins. With a rifle pointed at his midsection, Jenkins indicated that he didn't have any money. After the masked man informed him that he was deadly serious and threatened to blow his head off, Jenkins "cooperated" by giving the robber a ten dollar bill. A brief dialogue between the two revealed that Jenkins' assailant had a very distinctive voice which was both soft and stuttering. Ordered by the masked man to "get in the car and get out of here," Jenkins drove to a neighbor's house and called the police, who arrived shortly thereafter.

Jenkins described the masked man to the police as a teenager, between 5′ 6″ and 5′ 10″ tall, very heavyset, having dark hair and dark eyes, and who spoke with a soft or low, stuttering voice. He also gave the police a description of his assailant's clothing.

A day or two later, the police showed Jenkins a photograph of the Defendant. After observing the photograph, while a card was held over the nose and mouth to simulate a mask, Jenkins stated that the photograph matched the physical appear-

1. 17–A M.R.S.A. § 651(1)(E).

ance of his assailant but that, without hearing the suspect's voice, he could not make a positive identification under oath.

Thereafter, the sheriff informed the Defendant that he was a suspect in the case and that Jenkins thought he could identify the voice of the person who robbed him. The Defendant agreed to talk to the sheriff in Jenkins' presence. Later that week Jenkins stood behind a partition in the sheriff's office and listened to the Defendant converse with the sheriff. After hearing the voice, and observing him when he left the office, Jenkins identified the Defendant as his assailant.

At the outset of the jury trial the Superior Court held a *Boyd* hearing, *State v. Boyd*, Me., 294 A.2d 459 (1972), to determine first, whether the pre-trial identification was so suggestive as to be inherently unreliable, and second, if it was, whether the in-court identification had an independent basis, *State v. Broucher*, Me., 388 A.2d 907 (1978). After receiving extensive testimony, the presiding justice, relying upon a "totality of the circumstances" test and citing *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), ruled that notwithstanding the suggestivity of the pre-trial identifications, Jenkins' out-of-court identification of the Defendant as the person who robbed him was reliable. As the trial ensued, over the Defendant's objection, Jenkins testified as to the out-of-court identification and then in court identified the Defendant as his assailant.

■ While the presiding justice had ruled upon the legality of the out-of-court identification, it must be noted that when it came to the in-court identification, his ruling did not include on-the-record findings as to whether there was an independent basis for the in-court identification. On more than one occasion this Court has stressed that, in the interest of judicial economy, such findings should be put on the record, whether evidence of the pre-trial identification is found admissible or inadmissible. *State v. Boyd, supra; State v. Caplan*, Me., 353 A.2d 172, 175 n. 5 (1976).

■ Even with such a finding lacking in the record before us, we find it unnecessary to undertake that inquiry ourselves because we agree with the presiding justice's ultimate conclusion that the out-of-court identification was not impermissibly tainted. As such, the in-court identification is *per se* lawful. *See State v. Caplan, supra; State v. Boucher*, Me., 376 A.2d 478 (1977).

■ The admissibility of an out-of-court identification turns upon two factors: 1) whether the police used an unnecessarily suggestive procedure in obtaining an out-of-court identification and, if so, 2) whether under all the circumstances that suggestive procedure gave rise to a substantial likelihood of misidentification. *State v. Boucher, supra*. Otherwise stated, such admissibility depends upon weighing the corrupting influence of the suggestive police procedures against the indicia of an accurate identification. *Manson v. Brathwaite, supra; see State v. York*, Me., 324 A.2d 758, 767 (1974).

■ The State concedes that in this case the procedures surrounding the out-of-court identification were unnecessarily suggestive. Jenkins was not shown a photograph of anyone but the Defendant. Moreover, the photograph was a "mug shot," although it does appear that the police attempted to conceal the Defendant's identification number and other similar data. Equally damaging was the fact that Jenkins was informed that the subject of the photograph had previously been imprisoned on burglary charges, had a speech impediment, and was "a good suspect."

In *State v. Levesque*, Me., 281 A.2d 570 (1971) we were critical of photographic identification procedures far less suggestive than the ones involved in the instant case. As the U.S. Supreme Court admonished in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the danger of photographic misidentification is at its greatest when:

the police display to the witness only the picture of a single individual who generally resembles the person he saw . . . [and] is also heightened if the police indi-

cate to the witness that they have other evidence that . . . the perso[n] pictured committed the crime. *Id.* at 383, 88 S.Ct. at 971.

Although we have recognized that the use of photographs can be an invaluable tool in identifying persons suspected of criminal activity, *State v. Levesque, supra,* we perceive no reason why the police did not neutrally display an array of photographs "fairly representative of people who might fit the defendant's general description." *State v. Chapman,* Me., 358 A.2d 387, 392 (1976).

Our criticism of the police procedures surrounding the showing of the photograph to Jenkins extends equally to the "showup" of the Defendant at the sheriff's office. One-man showups are inherently suggestive in nature. *State v. Rowe,* Me., 314 A.2d 407 (1974). This suggestivity was increased because Jenkins was told that the suspect he would be hearing was the person whose photograph he had previously been shown. The suggestivity was unnecessary because there were no exigent circumstances, *see Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), which would have excused the police from at least making a good faith effort to procure other stutterers or individuals who could feign stuttering.

Against the suggestivity of the pretrial identification procedures, factors indicating an accurate identification must be weighed. Although by no means exclusive, these factors include the opportunity of Jenkins to view the assailant at the time of the crime, Jenkins' degree of attention, the accuracy of his description of the criminal, the level of Jenkins' certainty demonstrated at the time of the confrontation, and the time between the robbery and the identification. *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Such a balancing process determines the *reliability* of the out-of-court identification and hence its admissibility. *Manson v. Brathwaite, supra.*

Jenkins had ample opportunity to view the suspect. The record reveals that he observed the assailant for a period of two to three minutes at almost point-blank range. The minimal light and the suspect's mask in no way hindered Jenkins from observing that his assailant was short and extremely stout. More significantly, dialogue with the assailant revealed a characteristic so distinctive that an indelible impression became riveted in Jenkins' mind: his assailant spoke in a soft, low, stuttering voice.[2] In a town as small as Owl's Head the combination of these attributes in an individual other than the suspect was much less likely to occur than in a larger community.

The presiding justice placed great faith in Jenkins' high intelligence and integrity. Although the subtle effects of suggestive police practices may unduly influence even the most scrutinizing of human minds, the circumstances surrounding this case indicate that it was highly unlikely that Jenkins yielded to the suggestive identification procedures. After looking at the photograph of the Defendant, Jenkins was unwilling to make a positive identification until he heard the Defendant's voice, even though he was quite certain that the Defendant was the perpetrator. Even after he heard the voice of the suspect, he declined to make positive identification until he actually viewed the person. Only at that point was he convinced that the Defendant was the assailant. This caution in making an identification suggests that Jenkins was not unduly influenced by the identification procedures utilized by the police. *See State v. York, supra,* at 768.[3]

---

**2.** *See State v. York, supra,* at 765 (defendant's "lantern jaw" was unique feature which permitted victim to instantly identify him).

**3.** We recognize that uncertainty at the time of the out-of-court identification would generally militate against the reliability of the identification. However, in the instant circumstances a positive initial identification of the Defendant would have suggested that Jenkins yielded to the suggestivity of the identification procedures because he admittedly obtained only a limited view of his assailant in less than ideal conditions.

■ Jenkins' thorough and complete description, given shortly after the incident, accurately described the Defendant. The only clearly erroneous information was a discrepancy between Jenkins' characterization of the assailant as a teenager and the Defendant's age which was thirty-three. An accurate assessment of age, often difficult to make under normal circumstances, would have been practically impossible to determine in poor lighting with a mask covering the face of the robber. In any event, such discrepancy does not vitiate a description which in all other material respects (height, weight, color of hair and eyes, and manner of speaking) matches the Defendant's features.

Other factors indicate that the identification was accurate, particularly that only one week elapsed between the crime and the identification. In addition, the absence of extraneous factors which might have distracted Jenkins from observing his assailant combined with the presence of a deadly weapon leveled at him, points to the probability of a high degree of attention on Jenkins' part.

■ We recognize, as did the presiding justice, that this is a "close case." Nevertheless, our review of the totality of circumstances discloses that the factors indicating an accurate identification outweigh the suggestivity of the pre-trial identification to the point where there was no substantial likelihood of misidentification. Because the out-of-court identification was reliable, no error occurred in admitting testimony concerning either the pre-trial or in-court identification.[4]

■ The Defendant also attacks the sufficiency of the evidence, contending that the State did not prove beyond reasonable doubt that he was the perpetrator of the crime. There is no merit to this point. If identification testimony was admissible at all, as we hold it was, its weight was for the jury. *State v. Broucher, supra.*

The entry must be:

Appeal denied.

Judgment affirmed.

DELAHANTY, J., did not sit.

---

4. Our conclusion does not connote any tacit approval of the identification procedures utilized in the present case. On the contrary we expressly disapprove of them. With the exception of the one-way mirror context, *see State v. Northup,* Me., 303 A.2d 1 (1973) we have hitherto been reluctant to hold that a particular kind of pre-trial identification procedure is *per se* impermissibly suggestive. *See State v. York, supra.* Nevertheless, should unnecessarily suggestive identification procedures continue, we may be required to reassess our current position. *See State v. LeClair,* N.H., 385 A.2d 831 (1978).