STATE of Maine

v.

Gerald TRUE.

Supreme Judicial Court of Maine.

Argued May 5, 1983.

Decided Aug. 26, 1983.

Paul Aranson, Dist. Atty., Beth Anne Poliquin (orally), Asst. Dist. Atty., Portland, for plaintiff.

Glassman, Beagle & Ridge by Martin J. Ridge (orally), Portland, for defendant.

Before McKUSICK, C.J., and GODFREY, NICHOLS, ROBERTS, CARTER * and WATHEN, JJ., and DUFRESNE, A.R.J.

* Carter, J., sat at oral argument and participated in the initial conference but resigned before this opinion was adopted.

DUFRESNE, Active Retired Justice.

Gerald True was convicted of rape, 17–A M.R.S.A. § 252(1)(B)(1) (Pamph.1980), after a jury trial in the Superior Court (Cumberland County), and sentenced to ten (10) years in the Maine State Prison at Thomaston. The most telling evidence adduced against him at trial was testimony from the rape victim recounting her out-of-court identification of the defendant as the man who had raped her. Defense counsel had sought from the trial justice suppression of all evidence of identification of the defendant by the victim, the out-of-court identification as well as any in-court identification, arguing that the police procedure surrounding the out-of-court identification of the defendant was so inherently and unnecessarily suggestive as to raise a substantial likelihood of a misidentification, in other words, that it was itself unreliable and, thereby, fatally tainted any prospective in-court identification at trial. The trial justice after a hearing out of the presence of the jury ruled, however, that the defendant had failed to convince him by the preponderance of the evidence that the out-of-court showup of the defendant was unnecessarily suggestive, and that, irrespective of whatever suggestiveness might have been implicit in the circumstances surrounding the viewing, the State had convinced him by clear and convincing evidence that in the light of the totality of those surrounding circumstances the identification of the defendant is reliable. The justice denied the defendant's suppression motion, and this prosecution witness was permitted to identify the defendant at trial as the man who raped her, and the evidence of the out-of-court identification was also allowed. On appeal, defendant contends that the trial justice's evidentiary rulings were erroneous and that he is entitled to a new trial. We disagree.

### The Facts

The evidence presented at the suppression hearing will support the following facts. The rape victim, a young married woman, left her apartment at about 6:20 in the morning on September 13, 1981, intending to walk to work. She was employed at the Osteopathic Hospital on Brighton Avenue in Portland. In order to reach the hospital, she normally walked west along Park Avenue and turned right at the corner of Deering Avenue. Just north of that intersection, Deering Avenue becomes a bridge or overpass spanning Interstate 295. The victim's usual route took her over that overpass and a few blocks further north on Deering Avenue. She then turned left onto Brighton Avenue and proceeded straight along it until she reached the hospital.

On that Sunday morning, the victim walked along Park Avenue and turned onto Deering Avenue as usual. The sun was up and the weather was clear. As she approached the I–295 overpass from the south, she noticed a young man hitchhiking on the opposite side of the street. This man stepped up to her and asked her for a light. Without breaking stride, the young woman told him that she did not smoke. She did observe his face during this brief exchange. A moment later, the man grabbed her from behind and pulled her off the sidewalk, along a walkway running underneath the overpass. The victim began to scream, and the man put his hand over her mouth and told her to shut up or else he would strangle her. The man then pushed her down onto her back on the grass near the walkway and took off her pants, all the while trying to keep one hand over her mouth and threatening to strangle her if she did not cooperate. The man took down his own pants and penetrated the victim's vagina with his penis. The victim, though crying, had a clear view of her attacker's face. It was only when the rapist began to get up to leave, some ten minutes after he had grabbed his victim on the sidewalk, that he briefly placed his hands over her eyes.

The rapist fled, and the victim put her pants back on and ran home. There, she made three telephone calls: to her husband, a serviceman stationed out-of-state, to the Portland Police Department, and to her su-

pervisor at the hospital. Officer Drake of the Portland police arrived at the victim's apartment shortly before 7:00 a.m. He took down the victim's description of her attacker: a white male wearing a white shirt, with dark curly hair and acne scars on his face. The officer phoned the police dispatcher, relayed the information, and asked him to broadcast the description "as an all-car" bulletin. A few moments later, the hospital supervisor arrived, as did Sergeant Roper, the second Portland police officer. At that point, the supervisor stated to the three of them that during her drive from the hospital to the victim's apartment she had seen a white male with dark curly hair and brown pants walking on Brighton Avenue. The victim exclaimed, "That's the guy! That must be the guy!" or something to that effect.

Officer Drake again called the police department and communicated this new information to the dispatcher. Shortly thereafter, a call came back from the station informing Drake that one Officer Conicelli had stopped a subject on Brighton Avenue meeting the descriptions given by the victim and her supervisor. Sergeant Roper left the victim's apartment to assist Conicelli with the subject.

The victim, according to her own testimony and that of Officer Drake, did not hear the report that a suspect had been stopped, and did not know where Sgt. Roper was going when he left her apartment. Sgt. Roper thought that she did. Apparently, the victim had been in the bedroom of her apartment, when the report came in to Officer Drake; she was packing a change of clothing at the police officers' direction. She had been told that they would take her to a hospital for a physical examination, and they advised her that the clothes she was wearing might have to be kept as evidence. Before Sgt. Roper left the apartment, the victim had been asked to which hospital she wanted to be transported for the examination; she had chosen the Osteopathic Hospital.

The victim left her apartment with Officer Drake a few minutes after Sgt. Roper had departed. They drove towards the Osteopathic Hospital along the same route that the victim customarily walked. Officer Drake did not tell the victim that a suspect had been stopped along that route, nor did he ask her to keep an eye out for the man who had attacked her. As the police vehicle drove along Brighton Avenue, they passed three men standing on the sidewalk. Two of those men were uniformed police officers: Sgt. Roper and Officer Conicelli. The third man was the suspect Conicelli had stopped: defendant Gerald True. The defendant was not handcuffed, nor under any visible restraint when the car containing Officer Drake and the victim passed. As the car drew even with the three men on the sidewalk, the victim cried out, "that's the guy!" She immediately recognized the defendant, so she testified, and she was constant throughout, as respects her identification, with unyielding obstinacy, stating there was no doubt in her mind but that the man she saw on the sidewalk was the same man who had raped her earlier that morning. The victim had not recognized either of the two officers on the sidewalk, even though one of them had been in her apartment earlier that morning. Officer Drake further testified that, when the victim identified the defendant as her rapist, she also blurted out that "[s]he could never forget his face."

### Admissibility of Identification Evidence

A well-established line of federal and state decisions govern this case. The due process clause of the United States Constitution [1] has been held to protect a criminal defendant from the use against him at trial of an out-of-court identification that is "conducive to an irreparable mistaken identification," *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), or "so impermissibly suggestive as to give rise to a very substantial likelihood of

---

1. U.S. Const. amend. XIV.

irreparable misidentification," *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The ultimate concern is the reliability of the out-of-court identification; "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

■ A two-part test is used to determine the admissibility of an out-of-court identification under this standard. This test, articulated in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), first requires the trial judge to determine whether the identification procedure used by law enforcement personel was "suggestive." The defendant has the burden of proof at this stage. *State v. Cefalo,* 396 A.2d 233, 238 (Me.1979). He must demonstrate by a preponderance of the evidence that the identification procedure tended to "increase the likelihood of misidentification." *Neil v. Biggers,* 409 U.S. at 198, 93 S.Ct. at 382.

On the other hand, if the procedure used was not inherently suggestive, its results are admissible at trial. *See State v. Commeau,* 438 A.2d 454, 458 (Me.1981).

Once the defendant's initial burden is met and the identification procedure is shown to be unnecessarily suggestive, the results of the confrontation may still be admitted against a defendant at trial, if "under the 'totality of the circumstances' the identification was reliable even though the confrontation was suggestive." *Neil v. Biggers,* 409 U.S. at 199, 93 S.Ct. at 382. *See also State v. Rowe,* 314 A.2d 407, 414 (Me. 1974). This is the second part of the test of *Neil v. Biggers.* The "totality of the circumstances" to be considered in evaluating the likelihood of misidentification includes: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Neil v. Biggers, supra.* At

this second stage of the test, the State has the burden of proving by "clear and convincing evidence" that the identification, nevertheless, is reliable, although the procedure used was suggestive. *State v. Cefalo,* 396 A.2d at 238; *State v. Doughty,* 408 A.2d 683, 686 (Me.1979).

In the case at bar, the trial justice found that defendant Gerald True had not met his burden of proving that the procedure used by the police to obtain the out-of-court identification of him by the victim was "unnecessarily suggestive." On the record in this case, we agree with the justice's legal conclusion.

■ A "suggestive" confrontation between witness or victim and a defendant is a confrontation "conducive" to a mistaken identification. *State v. Doughty,* at 687. Among the most suspect of all procedures is a confrontation in which a single subject is presented to the witness in such a way that the witness knows that the police believe that subject to be the perpetrator of the crime. The danger in these situations is that the witness, eager to cooperate with the police and perhaps impressed by the officers' professional crime-fighting expertise, will subtly alter his or her own recollected image of the perpetrator's appearance and other characteristics to match those of the suspect presented. *See generally* P. Wall, *Eyewitness Identification in Criminal Cases* 26–65 (1971). Thus, the classic "showup" confrontation (where the police bring a single individual before the witness, which in and of itself indicates that they think that individual is the sought-after criminal) is universally viewed by the courts to be inherently suggestive. *See, e.g., Summitt v. Bordenkircher,* 608 F.2d 247, 252 (6th Cir.1979) *aff'd sub nom. Watkins v. Sowders,* 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) ("A showup is inherently suggestive. When only one person is presented to a witness, there is a natural tendency for the witness to feel obligated to provide a positive identification"); *State v. Barlow,* 320 A.2d 895, 903 (Me.1974) ("[Defendant] was in fact presented singly and in

a setting which marked him conspicuously as *the* suspect"); P. Wall, *supra,* at 28 ("[the showup] constitutes the most grossly suggestive identification procedure now or ever used by the police"). *See also State v. St. Onge,* 392 A.2d 47, 51 (Me.1978) (One-man showups are inherently suggestive in nature, quoting *State v. Rowe,* at 413).

▮ Defendant Gerald True was, in a sense, viewed singly by the rape victim on the morning of September 13, 1981. However, the identification procedure used in this case presents most important redeeming and mitigating aspects: (1) the police did not indicate to the victim that *they* believed defendant was the man who had raped her; (2) the victim did not know that she was to be driven past a suspect or even that a suspect had been stopped;[2] (3) the defendant was not in handcuffs or otherwise visibly under restraint when viewed by the victim; (4) the victim did not recognize one of the policemen standing with True as an officer already involved in her case, and she did not know the other one; (5) Officer Drake, the driver of the car in which the victim was riding, did not draw her attention to the men on the sidewalk either by word or by deed as the vehicle approached them. Although the defendant was seen in the company of two law enforcement officers, it is not uncommon to observe civilians conversing with policemen on public sidewalks, and we do not think that this circumstance alone would suggest to the victim that the non-uniformed member of the sidewalk group was under investigation for her rape. In short, although the police clearly viewed True as a rape suspect and were anxious to see whether the victim could recognize and identify him, the victim herself did not know and had little reason to suspect this. Thus, the confrontation in this case would not necessarily tend to suggest to the victim that the defendant was her attacker.

▮ In fact, the out-of-court identification in this case resembles the "chance encounter" more closely than the "showup." In *Allen v. Moore,* 453 F.2d 970 (1st Cir. 1972), the court upheld an out-of-court identification based on two witnesses' chance sighting of a bank robbery defendant on the street some two weeks after the crime.

> No problem results from the chance meetings. They were neither avoidable, unfair, nor suggestive. Spontaneous identification under such conditions might be said to emphasize the witness' reliability, rather than the reverse.

453 F.2d at 974. The court noted that "any display believed by the witness to be intentional must, to a certain extent, be suggestive," *Id.,* thus implicitly approving the chance-encounter identification precisely because the witness did not think that the defendant was deliberately being displayed as a suspect in the crime. *See also State v. Doughty,* 408 A.2d at 687 (no problem resulted from mugging victim's sighting of defendant walking on street two days after mugging, where victim testified he immediately recognized defendant as the man who had mugged him). The confrontation with the defendant in this case appeared to the victim to be a chance-encounter. It is the probable effect of an identification procedure on the witness' mental processes that renders it suggestive or not; the subjective motives or knowledge of the police are immaterial. We hold, therefore, that the out-of-court identification admitted against Gerald True at trial was not obtained through an improperly suggestive procedure, and need not have been excluded from evidence.

▮ Even if the identification in this case were obtained through a suggestive procedure, it would be admissible at trial due to its reliability. The victim's performance meets all of the criteria listed by the Supreme Court in *Neil v. Biggers,* 409 U.S. at 199, 93 S.Ct. at 382 (and repeated by this

---

**2.** The trial justice so found on disputed testimony. Sergeant Roper thought the victim knew

that a suspect had been stopped.

court in *State v. St. Onge*, 392 A.2d 47, 51 (Me.1978)), as indicative of reliability. She had had a good opportunity to observe the criminal at the time of the crime. She had had "particular reason to be attentive" during the rape itself. *State v. Cefalo*, 396 A.2d at 233. Her initial description of the rapist substantially matched the actual appearance of Gerald True, who is a white male with dark curly hair and bad acne on the face, and who was wearing a white shirt.[3] She demonstrated great certainty when she made the identification, and the identification took place less than an hour after the rape. Thus, even if the identification procedure were deemed to be flawed by suggestiveness, we would still be confident that the identification itself was reliable and did not violate the defendant's due process rights.

The entry is:

Judgment of conviction affirmed.

All concurring.

---

**3.** *Cf. State v. St. Onge*, 392 A.2d at 51–52 (victim described robbery suspect as a "teenager" when in fact defendant was thirty-three years old; court held identification reliable); *State v. Cefalo*, 396 A.2d at 241 (victim described rapist's eyes as one color where defendant's were another; court held identification reliable). Victim's failure to mention that the defendant had a mustache (the officers also did not notice the mustache) and that the white shirt that he was wearing had a yellow stripe (the victim stated that she knew there was a pattern on the shirt, but did not know what it was), did not obliterate the substantial accuracy of her description of the assailant.