**STATE of Maine**

v.

**John JASON.**

Supreme Judicial Court of Maine.

Oct. 25, 1978.

Joseph M. Jabar, Dist. Atty., Michael D. Seitzinger (orally), Asst. Atty. Gen., Augusta, for plaintiff.

Sandy & Sandy by Robert E. Sandy, Jr. (orally), Joan Phillips Sandy, Waterville, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and NICHOLS, JJ.

POMEROY, Justice.

Appellant was indicted on February 2, 1977 on charges of sodomy, 17 M.R.S.A. § 1001[1] and taking indecent liberties, 17 M.R.S.A. § 1951.[2] A jury trial culminated in a verdict of guilty as to the sodomy charge. Appellant's motion for a new trial was denied, and this appeal was timely taken.

The prosecution's chief witness was the 5-year old victim, appellant's step-daughter. Prior to trial, the Court conducted a hearing to determine whether the prosecutrix was competent to testify. He determined that she was, but reserved the right to reverse his decision should he later feel that it was necessary to do so. During the presentation of the State's case, the prosecutrix repeatedly failed to identify the appellant as her assailant, and stated that she could not identify or describe him. After a discussion in chambers, the presiding Justice authorized an in-court line-up, which was held in the presence of the jury. The prosecutrix identified the appellant at the line-up.

Appellant raises numerous issues for our consideration. Because we can dispose of the appeal on two related issues, we need not address the others.

Appellant initially contends that given the totality of the circumstances, the mere occurrence of the in-court line-up deprived him of his right to the due process of law. Failing in that, he argues alternatively that the manner in which the line-up was conducted constituted a denial of his right to due process.

We sustain the appeal on the basis of the second point and, therefore, shall only briefly touch on the first.

■ No cases have been cited to us, and we have found none, in which a court has held that an in-court line-up arranged specifically to allow a witness to identify the defendant as the perpetrator of the crime in question, violated, by itself, defendant's constitutional right to due process of law. Such a holding would be tantamount to a *per se* rule prohibiting in-court line-ups. Although we would be quick to point out the possibilities for prejudice inherent in such a procedure, we are unpersuaded that an in-court line-up would be inappropriate in every conceivable situation. We therefore, decline to adopt a *per se* rule prohibiting them. Our refusal, however, should in no way be read as a condonation of in-court line-ups.

Appellant's second contention concedes, *arguendo*, that the line-up did not *per se* violate due process, but argues that the manner in which it was conducted constituted such a violation in the totality of the circumstances. We agree. Since this determination hinges on the *"totality of the circumstances," State v. Boucher,* Me., 376 A.2d 478, 479 (1977), a review of those circumstances is a necessary foundation for the presentation of our decision.

During direct examination by the State, the prosecutrix was repeatedly asked, in effect, if she could identify her assailant. Seven times she was asked, and seven times she answered that she could not.

At this point, the State requested and received a recess, during which counsel for

---

1. Repealed P.L.1975, c. 499, § 5.

2. *Id.*

both parties discussed the matter with the court in chambers. The Assistant District Attorney then offered suggestions by which he might break the impasse which had been reached.

> [THE STATE]: I'd like to put on the record, your Honor, that this is obviously an extraordinary case and we would like to have great latitude in asking leading questions of this very young and delicate witness. We are at the point where we have to ask her to identify somebody . . . . What I would like to do is go around to the various people in the Courtroom and say, did this person do it, did this person do it, and I'll go to the Defendant, whichever number defense counsel would like, number two, number twelve, obviously, if she says yes to the wrong person, we're dead.
>
> THE COURT: You want a line-up?
>
> [THE STATE]: It sounds like it and it's not far from it . . . .
>
> .    .    .    .    .
>
> [THE STATE]: Would you permit us to go around?
>
> THE COURT: I'm thinking about it.
>
> [THE STATE]: I don't think she understands the significance of him sitting at that second table.
>
> THE COURT: Well, you ought to do this in the absence of the Jury in the first instance. If she can't make an identification in the absence of the Jury, then you're not going to put her through that with the Jury or do you want her to try to do it with the Jury.
>
> [THE STATE]: I'd rather try it with the Jury and if she doesn't do it, at least, I'd have done the best possible job that I can, if she doesn't do it.
>
> .    .    .    .    .

When the recess was called, the prosecutrix had gone to the back of the courtroom to sit with her natural father; a conversation took place which was later repeated in chambers as follows:

> THE COURT: I want you to answer me truthfully, we have a problem here because she has thus far been unable to identify whoever may have been or done what she says, put his tool in her mouth. She then went back and talked to you. I have to know, tell me in your own words, exactly what was said between the two of you.
>
> [FATHER]: I said, did you see Daddy John here and I says, why didn't you tell them. I says are you scared of him and she says yes, she started to cry.
>
> THE COURT: Yes, I saw her starting to cry.
>
> [FATHER]: That's all I said.

Following the recitation of this conversation, the presiding Justice nevertheless determined that he would allow a line-up to be conducted.

> THE COURT: I'm going to let the case proceed in spite of what he said and just tell you honestly that if she now identifies the defendant, the appeal will probably be in your favor. I don't want to let this Defendant go without giving the State an opportunity, even though they tread on thin ice, to try to do it. I'm ruling that they can have a line-up.

Defense counsel then objected.

The presiding Justice refused, however, the State's request that it be allowed to single out each individual and ask whether this person had been her assailant. Instead, the line-up was conducted as follows: Seven men, including the prosecutrix's father, were lined up in the prosecutrix's presence. After she had been escorted from the courtroom, the appellant was added to the line-up. The jury then entered the courtroom. The prosecutrix returned and the process began.

> THE COURT: Now, I want you to just lead her up to the middle of the Courtroom about ten or fifteen feet near those men and, young lady, you said a man put his toy in your mouth, did you say that?
>
> THE WITNESS: Yes.
>
> THE COURT: All we want you to do, and all we are asking you to do is to go up there and let us know who it is, if any of them. Can you point to the man?
>
> [THE STATE]: Would you point to him, honey, point right to him.

*THE CLERK: Point to the man that did it.*

Prosecutrix thereupon pointed to appellant.

We begin with the question of whether the identification procedure was unnecessarily suggestive, and if so, whether in the totality of the circumstances that suggestiveness gave rise to a substantial likelihood of misidentification. *State v. Boucher, supra,* at 479.[3]

### A. *The Line-up Procedure*

■ We find the line-up procedure employed in this case to have been unnecessarily suggestive, tending to direct the attention of the witness to appellant. While the prosecutrix watched from the stand, seven men, not including appellant, were arranged in a line-up. The prosecutrix was then removed from the courtroom, and appellant brought in and placed approximately in the middle of the line. The witness was returned to the courtroom and confronted with the line-up. The line-up which she had seen organized had now been changed by the addition of appellant. *Compare, State v. Boucher, supra,* at 480.

More suggestive than this physical arrangement, however, was the sequence of questioning that followed. Although he attempted to phrase his question impartially,[4] the presiding Justice—perhaps inadvertently—added his prestigious weight to the forces pressuring the witness to make an identification. The urging by the Clerk of Court to *"[p]oint to the man that did it"* was likewise suggestive, particularly inasmuch as the witness had been left in her custody during the trial recess, and she was, therefore, a somewhat familiar figure. Thus, in rapid succession, the prosecutrix was urged to identify *"the man that did it"* by the Court, the Assistant District Attorney, and the Clerk. The pressure of such authority upon a frightened 5-year old was a formidable force. Added to the import of the conversation, just earlier, with her fa-

ther, the danger of impermissible suggestion was too great for us to now condone.

■ We are particularly concerned, also, with the suggestiveness of this procedure as it may have affected the jury. The jury had heard the prosecutrix fail repeatedly to identify the perpetrator on the stand. The line-up procedure, coupled with the nature of the questioning by the Court, the Clerk, and the Assistant District Attorney, cumulatively presented the danger that the jury would infer a conviction on the part of the court personnel of appellant's guilt, and adopt that conviction as evidence. Such active participation, in such unusual circumstances, is impermissible.

In these circumstances the jury was forced to choose between the witness's failure to identify appellant during her testimony on the stand and her later identification of him in the line-up. The prosecutrix having failed to testimonially indicate appellant as her assailant, the conducting of a suggestive line-up may have indicated to the jury that the Court was unsatisfied with her earlier testimony, and that they should not accept it as true and complete.

The jury, in addition, was unaware of the conversation between the prosecutrix and her father during the recess, and of the fact that she had been present when the first seven men were arranged in the line-up; the credibility of her identification was enhanced by this ignorance.

### B. *Other Indicia of Reliability*

We come now to the second prong of the analysis established in *Boucher, supra;* whether, assuming an unduly suggestive confrontation, the identification was nevertheless reliable under the totality of the circumstances.

■ In *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the United States Supreme Court set forth a number of factors which could operate to

---

**3.** Although *Boucher* entailed a pre-trial out-of-court identification, the analysis is equally applicable here.

**4.** *THE COURT: . . . let us know who it is, if any of them. Can you point to the man?* (Emphasis added)

salvage a suggestive identification by establishing independent guarantees of reliability. These factors include the opportunity of the witnesss to view the criminal actor; the degree of attention paid by the witness; the accuracy of the description; the witness's level of certainty, and the time between the crime and the confrontation. 432 U.S. at 114, 97 S.Ct. 2243. (Citing *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972))

None of these factors, applied to the facts of this case, can save the line-up conducted below.

■ The lack of detail supplied by the prosecutrix on direct examination, while perhaps understandable, precludes the operation of many of the factors to support her identification of appellant. Thus, for example, there is no evidence of the conditions under which the act allegedly occurred such as would permit an inference as to the victim's opportunity to view her assailant. Any conclusion as to whether the act occurred in darkness or light, whether the attacker's face was concealed, or any such circumstances could be based only on conjecture.

As to the degree of attention, *Manson* makes clear that this element encompasses the witness's ability to observe, remember and recount details of the act witnessed. 432 U.S. at 115, 97 S.Ct. 2243. Here, however, the witness's tender age and her in-court testimony reflect either a fragile memory or an inability to coherently express her recollections, or both. In a related vein, she gave no description of her assailant, beyond identifying him as a man, and the record does not disclose any indication of a pre-trial description.

The fourth element set forth in *Manson* is the witness's level of certainty. As discussed, *supra,* the prosecutrix repeatedly failed to identify appellant during her testimony, and the line-up identification was preceded and accompanied by impermissibly suggestive occurrences. Further, there is evidence in the record of only a tentative identification at the line-up.[5]

Finally, the time lapse between the alleged crime and the confrontation does not lend reliability to the identification. Trial was held on May 2 and May 3, 1977; the indictment alleges that the act of sodomy occurred on February 11, 1975. Prosecutrix was born on June 18, 1971. Assuming the indictment to be correct, she would have been approximately three and one-half years old at the time of the offense, which would have been nearly two and one-half years prior to the line-up identification.

She described the act as happening *"a long time [ago],"* although she says she was *"still five"* years old at the time. Assuming her latter statement to be correct, the act must have occurred sometime after June 18, 1976—perhaps as long as 10 and ½ months prior to the confrontation.[6] It was, in any event, *"a long time"* ago, by the witness's estimation.

The State properly points to the fact that a young victim of a crime with the traumatic impact of this one is not likely to soon forget its occurrence, or the identity of the perpetrator. As a general proposition, that is undoubtedly so. We cannot, however, derive from that premise the conclusion that appellant was accurately and reliably identified without assuming other facts incompatible with his presumed innocence. The State's argument, for example, presupposes both that prosecutrix's assailant was known to her, and that the act occurred under circumstances permitting of a positive and memorable identification. Such

5. Appellant in his brief asserts that *"She clearly failed to identify the Defendant in her first attempt, and had to be taken forward to the line at the Justice's insistence before the Justice directed the record to reflect that she had identified the Defendant."*

The State, however, is equally convinced that *"there is no indication in the record of any*

*uncertainty on the part of the witness in pointing to the Defendant two separate times."* The record is ambiguous.

6. If prosecutrix is accurate in this respect, the State's case against appellant would be fundamentally shaken, inasmuch as the sodomy statute (17 M.R.S.A. § 1001) was repealed as of May 1, 1976. P.L.1975, c. 499, § 5.

assumptions are unwarranted, and cannot be a basis for sustaining the conviction.[7]

In summary, although we cannot say that an in-court line-up violates *per se* a defendant's right to due process, there are situations where, in the totality of the circumstances, an identification resulting from such a procedure is impermissibly tainted. Such is the case here.

We take this opportunity to repeat our earlier disclaimer; this opinion in no way condones in-court line-ups. We find the procedure to be fraught with the possibilities of prejudice, and to be avoided except in the rarest of cases.

Appellant is entitled to a new trial.

The entry must be:

Appeal sustained.

Judgment of conviction vacated.

Remanded for further proceedings consistent with this opinion.

GODFREY, J., did not sit.

---

**7.** *Compare State v. St. Onge,* Me., 392 A.2d 47 (1978).